## UNITED STATES v. SOUTHERN GULF LUMBER CO.

### No. 767.

United States District Court
S. D. Alabama, S. D.

Aug. 14, 1952.

Percy C. Fountain, U. S. Atty., Wm. H. Cowan, Asst. U. S. Atty., Mobile, Ala., for plaintiff.

C. M. A. Rogers (of McCorvey, Turner, Rogers, Johnstone & Adams) Mobile, Ala., for defendant.

THOMAS, District Judge.

Plaintiff seeks recovery of $8,095.64, alleging overpayment for water furnished under contract by defendant to plaintiff.

The only question of fact before the court is: Was the defendant paid for more water than the plaintiff actually consumed? If it was, the decision must then turn on questions of law involving the interpretation of the contract and the amendment thereto terminating the service.

The facts are as follows:

Pursuant to the contract which was entered into on March 1, 1942, the defendant was to furnish to plaintiff the necessary supply of fresh water to the Post Utilities Office, Brookley Field, for drinking and sanitary facilities and fire protection, to be paid for by the government at rates set out in the contract based on gallonage consumed. The premises to be served were leased by the government from the Southern Furniture Manufacturing Company, and were adjacent to the property of defendant. The water was furnished through one main, two inches in diameter, located on the south end of the leased premises, and the consumption was measured by one meter.

The contract was in force from March 1, 1942, until its termination on September 20, 1945. The plaintiff alleges monthly overpayments from April 30, 1942, through March 5, 1945. During that time the personnel on duty in the Post Utilities Office varied from a maximum of 720 to a minimum of 2.

■ The first person to read the meter was Lt. James W. Brown, Post Utilities Officer. The meter was set at "0000000" for the beginning date of March 10, 1942 (that being the first date water was actually furnished under the contract). Lt. Brown's recording of his reading on April 30, 1942, was "719,900", as the number of gallons consumed, or an average per person on duty in the Post Utilities Office during that time of around 135 gallons a day. Lt. Brown also read the meter on June 6, 1942, and recorded this reading as "1,894,-300", from which figure the preceding month's recording was subtracted to show a total of 1,174,400 gallons consumed during the thirty-one days of May and the first six days of June (the personnel on duty having been almost doubled since the date of the last reading), or an average per person of around 154 gallons a day.

Beginning July 2, 1942, and continuing through February 3, 1945, the only person who read the meter and recorded the figures for billing purposes was Mr. Royal W. Randall, an employee of the plaintiff, although the contract provided: "Meters will be read monthly on the last day of each month jointly by a representative of the contractor and the contracting officer or his representative." Mr. Randall's recordings of his readings were furnished by him to the authorities at Brookley Field, and they in turn furnished the figures to the Southern Gulf Lumber Company. The lumber company, without making any check of the meter, prepared its invoice, billing the plaintiff at the rates shown in a graduated scale on the contract. Thereupon voucher was prepared and check on the Treasurer of the United States mailed to Southern Gulf Lumber Company for the amount of the invoice.

In the early spring of 1945, Mr. Randall went to the hospital for five or six weeks, and on March 5, 1945, Captain V. C. Wroblewski, Major Blonheim, and Mrs. Edwina P. Currie, an office employee, went to the location of the water meter and made a record of the consumption to date, as shown by the meter on March 5, 1945. Upon their return to the office, this figure was, of course, compared with the previous monthly recording in an effort to subtract the previous recording from the current one and thus obtain the monthly consumption. It was discovered, however, that this latest recording was almost 50,000,000 gallons less than the recording which Mr. Randall had turned in for the preceding month. In order to make the current recording "balance", it was necessary to add a zero digit to this last recording. The investigation thus precipitated has culminated in this suit.

The meter was photographed on April 14, 1945, and on May 5, 1945, which photographs were introduced as exhibits. Although it is not necessary to describe minutely the face of the meter, suffice it to say it consisted of seven dials, each with an indicator, and each dial registering gallons up to 100; 1,000; etc., respectively. Thus the seventh dial registered up to 100,000,-000. The reading of the dials is comparatively simple, though it is easily seen how an incorrect interpretation of the reading may be made.

Mr. Randall testified on the trial of this cause that it was he alone who had read and recorded the readings of the meter

from July 1942 to the date of his illness; that in recording the figures he had obtained from the meter, he had invariably added a zero to the right of the figures he had obtained from the dials of the meter, because it was his understanding that the addition of the zero was necessary to show correctly the true consumption of water. In other words, from the 100-gallon dial on the meter, Mr. Randall put down three digits instead of two. That Mr. Randall did suffix a zero to each monthly reading made by him is evident from an examination of the monthly recordings which he furnished for billing purposes.

Mr. Andrew Schottgen, an experienced meter reader for the City of Mobile, also testified, and read the meter as photographed. His testimony substantiated the fact that the readings of the meter had been incorrectly recorded by Mr. Randall, in that he had added an extra zero to each reading.

Other substantiating evidence that the meter readings were incorrectly recorded by Mr. Randall is to be found in that portion of the contract wherein the estimated cost per year of the water to be consumed was $300, as compared with the amount paid to the defendant over a period of thirty-four months, purporting to represent actual consumption. According to the estimate of $300 per year, as set out in the contract, the amount would have been approximately $850 for the thirty-four months during which the meter readings were erroneously recorded. The correct billing, as claimed by plaintiff, would have been $1,132.42. The actual amount paid by plaintiff was $9,238.06. There is also the evidence of the radical decrease in the amount of the monthly water bills after the error in the recording of the meter readings was discovered.

The evidence convinces me beyond any doubt that the meter readings from the inception of the contract up to and including the month of March 1945 were incorrectly recorded, during which time plaintiff actually overpaid to the defendant $8,095.64, for water which plaintiff did not consume, and which the defendant did not furnish to plaintiff.

## Opinion with Conclusions of Law

The defendant based its defense of this action on three separate grounds: (1) the general issue; (2) paragraphs (g) and (h) of the original contract; (3) terms of the amendment terminating the contract.

That portion of the original contract upon which defendant bases its second defense reads as follows:

"(g) Error In Meter Readings.—Meters will be read monthly on the last day of each month jointly by a representative of the contractor and the contracting officer or his representative. The contractor shall render monthly accounts to the contracting officer which shall contain statements of the readings of the meters at the beginning of the period, meter constants, monthly consumption, rates and allowances, if any, in detail. That in case of error in meter readings it is mutually agreed that the percentages of error shall apply only to the water used since the date of the meter reading of preceding month.

"(h) Failure of Meters to Register.—That if the meters fail to register, a daily average will be obtained from the readings taken the previous month when the meter was known to be operating correctly, and this figure used as a basis of payment for the period while the meters are out of order and until repaired."

It is my opinion that paragraphs (g) and (h) are not applicable in the instant case, and this conclusion rests upon a logical consideration of the facts as well as a logical and equitable construction of paragraphs (g) and (h).

The purpose of paragraph (g) was to attempt to fix a formula whereby injustices to either party because of unknown error, either human or mechanical, could be rectified. The realization that errors, both human and mechanical, are likely to show up in any meter recording or reading, and that such errors, if not rectified, work injustices, provides, I think, the only reasonable explanation for paragraph (g) appearing in the contract.

The error in the instant case is not an unknown error. It was an exact, constant error made in the recording of each meter reading from the inception of the contract up to and including the 5th day of March 1945. From the facts, the exact amount of water consumed can be ascertained to a mathematical certainty; the amount of water paid for is a known quantity.

The whole intent of the contract was that the government would pay the defendant for the amount of water used, and the defendant would receive from the government its proper compensation for the amount of water furnished; why, then, the necessity for using some formula, which itself is none too.clear, and which definitely would arrive at an inequitable result?

The object of all legal actions is to arrive at a just result. From the facts in this case, the exact amount of water consumed by the government is easily and accurately ascertained. The rate to be paid for the water consumed is plainly set out in the contract. The just result, therefore, is that the government should pay, and the defendant should receive, compensation pursuant to the terms of the contract, for the water used by the government and furnished by the defendant. The defendant should not be paid less than the amount due for water actually used, and the government should not pay for more water than was actually used. Since these two figures, namely, the exact amount of water consumed and the price to be paid therefor, can be accurately ascertained by mathematical calculation, the proper verdict is simple.

■ Any construction other than the fact that paragraph (g) is not applicable in the instant case would contravene the well-established principle, "Where a contract is capable of a construction in accordance with justice and fair dealing, the court will adopt such construction, instead of a construction which will entail loss on a party to the contract." Bayne v. U. S., 8 Cir., 195 F. 236; U. S. v. Skinner & Eddy Corporation, D. C., 28 F.2d 373, and cases therein cited; 17 C.J.S., Contracts, § 319, pp. 739, 740, Note 60, and cases there cited.

It is obvious that paragraph (h) is not applicable because it contemplates a complete failure of the meter to register, which certainly was not the case here.

■ The amendment terminating the contract contains the following paragraph:

"The above numbered contract is hereby terminated as of 31 August 1945, without liability to Government or contractor."

This is the basis for defendant's third defense.

This amendment is a printed form used by the Mobile Air Service Command (Brookley Field). The name of the contracting officer is typed in the place for signature. It is not signed by him, although it was signed by John Proudfoot, Resident Manager of Southern Gulf Lumber Company. Its tenor is routine; its intent is now a matter for the court's interpretation.

It is my opinion that the words "without liability to Government or contractor" refer to further performance under the contract. The reason given for termination is "Services no longer required." The form further contains the printed notation: "All items and conditions applying on the original contract shall govern in the execution of this amendment."

■ It must be borne in mind that this phrase, "without liability to Government or contractor", is a part of a termination of the contract and not a rescission of the contract. It has many times been said that the mere termination of a contract is not a rescission. National Supply Co. v. Southern Creamery Co., 224 Ala. 507, 140 So. 590. See also 37 Words and Phrases, Rescission, 159. As is stated in 17 C.J.S. Contracts, § 404, at page 893: "The exercise of an option to terminate prevents liability for further transactions but does not affect obligations which have already accrued." All of the cases cited by the defendant under its third defense refer to rescissions of contracts and not terminations.

Let the government recover of the defendant the sum of $8,095.64, together with interest at the rate of 6% from the 3rd day of April 1945. An appropriate order will be entered.