## NORTHERN STATES POWER COMPANY v. LYON FOOD PRODUCTS, INC.

229 N. W. 2d 521.

May 23, 1975—No. 44689.

*Mackall, Crounse & Moore* and *Franz P. Jevne III,* for appellant.
*Carlsen, Greiner & Law* and *Jack D. Elmquist,* for respondent.

Heard before Otis, Todd, and MacLaughlin, JJ., and considered and decided by the court en banc.

TODD, JUSTICE.

Plaintiff appeals from a judgment for defendant on its claim for electrical services furnished but not billed, due to a meter defect, during the period February 1, 1967, through March 3, 1970. The lower court determined that defendant received some electricity for which it was not billed, but found that, although the meter was inaccurate on March 3, 1970, and at some time prior thereto, it was not apparent when it became inaccurate; and further, that plaintiff had not sustained its burden of proof as to the amount of its damages. We reverse.

Plaintiff, Northern States Power Company, is a Minnesota corporation engaged in providing electricity to users in the upper midwest. Defendant, Lyon Food Products, Inc., is a Minnesota corporation engaged in the processing and selling of spiced herring and ludefisk.

Prior to August 2, 1965, plaintiff installed metering equipment to measure defendant's usage of electricity. On August 2, 1965, an employee of plaintiff tested the metering equipment for accuracy. The test results indicated that the meter registered within .3 percent of standard. However, because there was no electricity then being used on defendant's premises, the employee

was unable to test the circuit between the current transformers and the meter to insure that all energy was being registered. On January 3, 1966, defendant subscribed to receive electrical service for its newly constructed premises located at 2301 Nevada Avenue North, Golden Valley, Minnesota. The electrical system installed at defendant's premises consisted of three "hot" wires, each of which supplied 120 volts of current. Under proper conditions, these three wires were hooked into the meter by three "jumper" wires, and the meter was to measure the total energy used by all three wires. Defendant's electric bill was based on the total number of kilowatt hours used during the month and the "demand" (i. e., the greatest amount of kilowatts used during any 15-minute period during the month).

From the commencement of electric service, defendant paid each monthly bill as it came due. Between February 1, 1967, and March 4, 1970, defendant paid the total sum of $5,764.20. The average monthly bill was approximately $156. Since records for service prior to February 1, 1967, were not available, plaintiff limited its claim to the period following this date. On March 3, 1970, an employee of plaintiff conducted a routine test and examination of the metering equipment at defendant's premises. This was the first test since the original installation in 1965. During the test, it was discovered that the three "jumper" wires were missing, resulting in a situation where the current from two of the "hot" lines was not going through the meter for registration. Thus, the meter was only registering the current used by defendant through one of the "hot" wires. The meter was tested both before and after replacement of the missing "jumper" wires. Prior to the replacement of the wires, the meter dial turned 8 revolutions in 120 seconds. After replacement, the dial turned 20 times in 120 seconds.

Mr. John Anderson, plaintiff's meter superintendent, upon receiving the report of a malfunction, directed the installation of a test meter to determine the extent of the malfunction. The meter was installed on March 18, 1970, and removed on April

2, 1970. It was connected so as to measure only the electricity used through the third "hot" wire, the wire which was being measured prior to the repairs. The existing meter continued to register defendant's total electricity usage during the 15-day period the test meter was in place. During the test period, the test meter registered a usage of 35-kilowatt hours and a top demand of .19 kilowatts through the third hot wire. The existing meter registered total usage of 107-kilowatt hours and a top demand of .64 kilowatts through all three wires combined. Thus, during the test period, defendant's total electricity usage was slightly over three times that of line three alone.

Immediately after replacement of the missing wires, defendant's average monthly bill rose approximately threefold. Anderson, accepted by the trial court as an expert witness in the field of metering equipment, testified that, in his opinion, during the period from February 1967 through March 1970, the meter located on defendant's premises was registering "very, very close" to one-third the electricity actually used by defendant during that period. In addition, Anderson testified that defendant's measured electricity usage from March 1970 to February 1973, following the meter repair, was approximately three times the measured usage of the period from 1967 to 1970 prior to repair of the meter. The one-third ratio could not be perfectly exact because of slight variations in the "balance" of the three lines. Any one line could, at any given time, have a different amount of current being used on its circuit. Also, the lines could be unbalanced due to the different types of machinery on each line. It is possible that all of Lyon's equipment could have been connected to just one line, although one of plaintiff's witnesses testified that this would be unlikely. It is to the economic advantage of the customer to balance his load equally over the three lines, and it is probable that the equipment in defendant's facility was closely balanced. The testimony of defendant's president was that no major equipment had been added to the facility in 1970 and only gradual replacement of machinery took place from 1967 to 1970.

He did not assert that the machinery in his plant was not "in balance."

Defendant points out that it was in no way responsible for the malfunction of the meter. Further, defendant relies on the fact that there was no direct testimony as to when the meter became defective. However, plaintiff's records of services and charges to defendant for the period in question show no material variations other than seasonal demands and establish a general pattern of consistency during the entire period. Moreover, plaintiff placed in evidence graphs illustrating the kilowatt hours and demand as registered on plaintiff's meter for defendant's service during the period in question. Plaintiff then graphed those figures as multiplied by three, further plotting the readings from the corrected meter for an additional 3-year period. Comparison of the graph charts for the period following discovery of the error with the multiplied readings recorded on the defective meter shows an amazing consistency.

Plaintiff computed the amount allegedly owed by defendant by multiplying the kilowatt hours originally charged for the period in question by three, taking into account the marginal decrease in rates for the increase in consumption and rate changes during the period. Under this method, plaintiff alleges that it was entitled to recover from defendant the sum of $10,842.49.

The lower court in its findings of fact found that on March 3, 1970, plaintiff's meter at defendant's place of business was not registering two of the three "in-take phases." The lower court further found that, due to the malfunction, defendant received some electricity for which it was not billed. It also found that the meter was inaccurate on March 3, 1970, and at some time prior thereto, but that it could not determine when the meter became inaccurate. Finally, the lower court concluded that plaintiff had not sustained its burden of proof as to the amount of improperly billed electricity and that the evidence did not sustain the mathematical computation that defendant had been billed for only one-third of its total usage.

■ Under Rule 52.01, Rules of Civil Procedure, findings of fact made by the trial court shall be set aside only if clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Factfindings are clearly erroneous only if the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. In re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972). A reviewing court will not disturb the trial court's findings of fact on appeal even though it might not agree with them unless they are clearly erroneous in the sense that they are manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole. Preferred Risk Mutual Ins. Co. v. Anderson, 277 Minn. 342, 152 N. W. 2d 476 (1967).

■ With these restrictions clearly in mind, we nevertheless come to the conclusion that under the facts and evidence of this case, the findings of fact and conclusions of law of the trial court are clearly erroneous. Initially, we hold that the evidence was more than adequate to establish the fact that the meter was inaccurate during the entire period which is the subject matter of this litigation. The finding by the trial court that the meter was inaccurate on March 3, 1970, and some time prior thereto, is uncontested by defendant. Examination of the exhibits discloses a consistency of usage during the entire period without any unreasonable fluctuations. Admittedly, there was no direct testimony as to when the meter became inaccurate, but the circumstantial evidence introduced in this case compels a finding that the meter was inaccurate during the entire period in question. A fact need not be established by direct evidence, but may be competently established by adequate circumstantial evidence. Trimbo v. Minnesota Valley Natural Gas Co. 260 Minn. 386, 110 N. W. 2d 168 (1961).

■ Having determined that the meter was inaccurate during the entire period, we must then consider the finding of the trial court that plaintiff failed to sustain its burden of proof as to

damages. The trial court in its findings established the fact that damage had occurred when it found that defendant had received some electricity for which it was not billed. This finding is not contested on appeal and is more than adequately sustained by the evidence. Having determined that plaintiff had suffered damage, the fact that it is difficult to establish the amount does not necessarily preclude recovery. The rule in Minnesota regarding uncertainty of damages was stated in Olson v. Naymark, 177 Minn. 383, 384, 225 N. W. 275 (1929):

"* * * All agree that in any case conjectural or speculative damages cannot be recovered. The award by a jury is not discretionary. The evidence must give a basis for a reasonable determination of amount. Along the line from speculation to certainty there is a point not found by mathematical demonstration where it can be said that a jury or other fact-finding tribunal can give a safe judgment of the amount of damages flowing from a breach. The law does not permit a recovery of damages which are merely speculative and it does not require proof to an absolute certainty."

In Story Parchment Co. v. Paterson Parchment Paper Co. 282 U. S. 555, 51 S. Ct. 248, 75 L. ed. 544 (1931), the court expressed the difference between damages uncertain in nature and damages uncertain in extent (282 U. S. 566, 51 S. Ct. 251, 75 L. ed. 550):

"The rule that damages, if uncertain, cannot be recovered, applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery."

Similarly, in Northrup v. Miles Homes, Inc. of Iowa, 204 N. W. 2d 850, 857 (Iowa 1973), the court said:

"Courts have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount

of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated."

In Ellis v. Lindmark, 177 Minn. 390, 397, 225 N. W. 395, 397 (1929), we said:

"* * * The tendency of the court has been to ascertain damages, when an actual wrong has been done, though doing so involves labor, rather than to deny relief with the easy statement that the damages sought are too speculative and conjectural or too remote to permit a recovery."

In Willmar Gas Co. Inc. v. Duininck, 236 Minn. 499, 506, 53 N. W. 2d 225, 229 (1952), in considering a claim for damages based on estimates of the quantity of gas that escaped from a broken pipe over a period of approximately one year, we said:

"* * * Here, the computation of plaintiff's gas loss was made by an expert using recognized methods. While not absolutely accurate, his conclusions as to plaintiff's losses undoubtedly bear a reasonably close relation to the actual loss sustained. No expert testimony was offered to contradict [the expert's] conclusions or to show that his estimates were not substantially correct."

The trial court, as stated in its memorandum accompanying its order for judgment, relies on two Federal cases which involved claims for payment for electricity furnished: Schofield v. John R. Thompson Co. 109 F. 2d 432 (6 Cir. 1940), and Puerto Rico Water Resources Authority v. United States, 135 F. Supp. 532 (Ct. Cl. 1955). In both of these cases, proof was limited to showing average consumption prior to the defect as opposed to the amount actually billed. In the first case, recovery was denied; in the other, it was allowed. The only distinction was that, in the latter, defendant's negligence contributed to the defect. However, in the case at bar, Northern States Power did considerably more than introduce evidence of consumption after the

defect was discovered. It did not simply maintain that defendant's consumption in the 1970 to 1973 period was the same as its consumption in the 1967 to 1970 period. Rather, it demonstrated the ratio of electricity used through line three, which had always been metered, to the energy used in total. Since the evidence indicates that this ratio remained reasonably consistent from 1967 to the test in 1970, defendant's consumption could be ascertained.

Judgment is reversed and the matter remanded with instructions to enter judgment for plaintiff in the amount of $10,842.49.

Reversed and remanded.