**McCARTHY WELL COMPANY, INC., Appellant,**

v.

**ALADDIN ELECTRIC COMPANY, Respondent.**

**No. C2-84-848.**

Court of Appeals of Minnesota.

March 12, 1985.

Michael A. Nekich, Richard Rapson, Leonard, Street & Deinard, Minneapolis, for appellant.

Robert J. McGuire, Mark A. Gwin, Cousineau, McGuire, Shaughnessy & Anderson, Chartered, Minneapolis, for respondent.

Heard, considered and decided by PARKER, P.J., and SEDGWICK and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Plaintiff-appellant McCarthy Well Co. (McCarthy Well) brought this action against defendant-respondent Aladdin Electric Co. (Aladdin) for non-payment of amounts allegedly due on a contract. Aladdin answered alleging McCarthy Well breached the contract, and counterclaimed for damages. The trial court issued find-

ings of fact, conclusions of law and an order for judgment in Aladdin's favor for $2,042.00. The judgment represented partial recovery by McCarthy Well on its claim and partial recovery for Aladdin on its counterclaim. McCarthy Well now appeals from the judgment.

## FACTS

In May 1978 Aladdin Electric Co. contracted to erect six light towers around the South St. Paul High School football field, three on both the north and south sides. Aladdin's erection plans required one hole for each tower, from 18' to 25' deep with a 48" diameter. Dan McGrath, a buyer for Aladdin, telephoned plaintiff McCarthy Well Co. on August 4, 1978 to ask about McCarthy Well's drilling services. During the conversation McGrath informed Earnest J. McCarthy about the project. They discussed the ground where the drilling would take place including the hilly terrain and, according to McGrath, the sandy soil. McGrath indicated that Aladdin wanted drilling to begin on August 7, 1978. McCarthy said they could begin drilling then and told McGrath that they would bill at an hourly rate for the drilling machine plus additional charges. McCarthy testified that he told McGrath that he would send a written acknowledgment of the order, which McCarthy filled out and sent to Aladdin.

The acknowledgment form contained numerous provisions, of which the following are important. It allowed Aladdin 10 days in which to object to any of its terms. It specified a rate for the drilling rig and operator, as well as an hourly rate for a tool and equipment truck. It further specified that Aladdin would provide a helper for the drilling rig operator. The back of the form contained fine print boiler plate language including a provision excluding McCarthy Well from liability for any consequential damages. The boiler plate also provided that the contractor, Aladdin, would supervise the drilling.

McCarthy Well began drilling the first of three planned holes on the south side of the field on August 7, 1978. Sometime before August 9, 1978, Aladdin received the written acknowledgment from McCarthy Well. Thomas Leonard, president of Aladdin, testified that he reviewed the acknowledgment form, without reading all the fine print, and noticed numerous additional terms which were not a part of the agreement formed by phone. Leonard testified that when he first saw someone from McCarthy Well personally, he objected to the acknowledgment. At trial Leonard could not identify who he spoke to or specify the terms to which he objected. Leonard indicated he objected to the acknowledgment to the extent it contained terms beyond those orally agreed upon. Leonard, however, did not object to the hourly rates for the drilling. All witnesses from McCarthy Well denied that Leonard or any other person from Aladdin objected to the acknowledgment.

McCarthy Well experienced difficulties as soon as it began drilling the first hole. During the first three days of drilling McCarthy made little progress on what it thought would be the easiest hole, because the walls of the hole kept collapsing. Leonard was aware of the problems and informed McCarthy Well that the lights had to be completed in time for the high school games that fall. McCarthy told Leonard that it would complete the drilling in time to allow completion of the project before the first scheduled game.

On August 9, the third day of drilling, Leonard asked McCarthy Well to stop drilling. McCarthy Well had completed only part of the first hole at that time. Leonard instead retained an excavator to dig bowl-shaped holes deep enough to plant a light pole. The excavator began working on two other holes on the south side of the field. On August 16 McCarthy Well returned to the job after convincing Aladdin it could complete the work. On August 17, after two days of drilling, McCarthy Well completed the first hole it had started earlier. Aladdin was still dissatisfied with the speed of McCarthy Well's work and turned again to the excavation method. Three holes

were eventually completed by excavation including one on the north side of the field.

On August 25, McCarthy Well returned to the site to remove a casing from the hole it had drilled so that cement could be poured. Aladdin apparently invited McCarthy to attempt drilling holes again. McCarthy Well worked on the site on August 25, 28, 29, and 30.

On August 28, Leonard consulted with an engineer who advised him to move the location for the holes on the north side of the field to a more level spot and to abandon the completed hole on that side. The engineer also indicated that a competent driller could quickly drill the holes. According to Leonard, it was only at this point that he realized the drilling problems were due to McCarthy Well's incompetence rather than the difficulty of the task. Aladdin then retained Tri State Drilling Co. which completed the remaining three holes in two days.

The project was sufficiently delayed that the high school could not play its first home football game on its field. The school district claimed it lost $2,000.00 in gate receipts and Aladdin settled the claim for $1,000.00.

After Aladdin refused to pay its invoice McCarthy sued Aladdin for $7,897.00 based on its hourly rate for drilling and other services. Aladdin counterclaimed for the $1,000.00 it had paid the school district, for money it had spent for excavation and restoration, for overtime paid to employees, for money it paid Tri State Drilling Co. and for the cost of compaction tests.

The trial court found that McCarthy Well was entitled to $1,915.00 for completing one hole, based upon the agreed rates. The court found that McCarthy Well's poor workmanship caused delays and problems resulting in the following damages to Aladdin:

| | |
|---|---|
| $3,802.00 | Expenses due to McCarthy Well's poor workmanship |
| ($1,720.00) | The benefit of having two holes completed |
| $2,082.00 | Subtotal |
| $ 620.00 | Reconstruction costs due to McCarthy Well's poor workmanship |
| $ 255.00 | Density testing |
| $1,000.00 | Settlement payment to South St. Paul High School |
| TOTAL | $3,957.00 |

## ISSUES

1. Did the trial court err by finding that Aladdin timely objected to the written acknowledgment?

2. Did the trial court properly disregard the consequential damage disclaimer in the written acknowledgment?

3. Does the record support the trial court's award to Aladdin for expenses it incurred allegedly as a result of McCarthy Well's poor workmanship?

## ANALYSIS

### 1. The Written Acknowledgment

■ McCarthy Well argues that the trial court should not have found that Aladdin timely objected to the written acknowledgment. Therefore McCarthy Well claims the terms of the acknowledgment should govern and it should recover the full amount of its invoice, $7,897.00.

McCarthy Well reasons that the trial court could not reasonably find Leonard seasonably objected because the parties' behavior can be explained no other way. McCarthy makes four points. First, Leonard's testimony on the substance of his objections is vague. He could not recall which terms he objected to. Second, Leonard indicated he did not read all the fine print, suggesting that he could not have objected to the fine print terms. Third, Leonard testified he normally uses written contracts when doing business. Fourth, without the terms of the written acknowledgment the parties' agreement is silent on important questions governing the contractual relations. According to McCarthy Well, it defies common sense to believe that McCarthy Well would have commenced its work had it been uncertain about what terms would govern the work.

Notwithstanding these points Leonard steadfastly claimed he objected to the written acknowledgment to the extent it went beyond matters discussed over the telephone. The trial court's findings of fact will not be disturbed unless clearly erroneous. *Lange v. Fidelity & Casualty Co.,* 290 Minn. 61, 65, 185 N.W.2d 881, 884 (1971). Viewing the record in the light most favorable to the verdict we are not left with a firm conviction that the trial court erred in deciding this question of fact. *See Northern States Power Co. v. Lyon Food Products, Inc.,* 304 Minn. 196, 201, 229 N.W.2d 521, 524 (1975).

### 2. Consequential Damages Disclaimer

■ McCarthy Well argues that the trial court should have applied the clause contained in the written acknowledgment form which disclaimed liability for consequential damages. Because we hold the written acknowledgment did not become a part of the contract, it follows that the clause does not control the award.

### 3. Damages

The trial court found that McCarthy Well's incompetent drilling caused Aladdin several types of expenses which were recoverable under the contract. McCarthy Well disputes those findings, arguing that those expenses were not caused by its breach. Again our review is under the clearly erroneous standard.

#### a. Cost of density testing

■ After the excavation bowls were filled around the light poles, a structural engineer requested density tests to insure the ground was sufficiently compacted to support the poles. Since evidence justified the trial court's conclusion that the excavation would not have been used if McCarthy Well had drilled in a workmanlike manner, we find the court's allowance of damages for the cost of density testing was not clearly erroneous.

#### b. Cost of settling with the high school

■ Evidence showed that McCarthy Well represented that it could drill all six holes within a short period of time, but that it failed to do so. Evidence also established that McCarthy Well's attempts to drill delayed Aladdin's completion of the project, which in turn rendered Aladdin liable to the high school for the income it lost by playing on the opposing team's field. Accordingly, evidence supports the trial court's award of these consequential damages.

#### c. Costs of excavating and reconstructing the landscape

■ McCarthy Well challenges the award compensating Aladdin for expenses it incurred in using the excavation method of making the holes. The trial court found that McCarthy Well was liable for the difference between the cost of competently drilling two holes and the cost of excavating those holes. It also found that McCarthy Well was responsible for 50% of the reconstruction costs. Substantial evidence supports both these conclusions.

■ After reviewing the testimony and documentation of the expenses, we find clear error in the trial court's calculation of these expenses. Testimony established that excavation was performed on August 10 and 11, 1978 and again later in August. The trial court's findings, however, attribute amounts invoiced for work on those dates to reconstruction costs. A second invoice, dated September 15, 1978 shows the balance for the excavation work, and details additional charges for work performed and materials supplied on September 5 through 11. Testimony indicated that reconstruction work occurred during that time. The work described includes charges for a compactor and the materials are denoted as clay fill and black dirt. The trial court, however, erroneously treated those charges as costs of excavating and used them to find the additional non-reconstruction expenses Aladdin unnecessarily incurred by using the excavation method.

## DECISION

We affirm in part, but remand to the trial court only for modification of its award of excavation and reconstruction expenses.

Affirmed in part and reversed and remanded in part.