GEORGE L. TRIMBO, d.b.a. ST. PETER TEXACO SERVICE,
v. MINNESOTA VALLEY NATURAL GAS COMPANY.

110 N. W. (2d) 168.

June 30, 1961—No. 38,189.

*Norman H. Nitzkowski* and *Gallagher, Farrish, Sheran & Zimmerman,* for appellant.

*Malcolm K. MacKenzie,* for respondent.

NELSON, JUSTICE.

Defendant appeals from a judgment in favor of plaintiff. George L. Trimbo, doing business as St. Peter Texaco Service, commenced this action against the Minnesota Valley Natural Gas Company to recover damages on account of a fire occurring at midnight on November 17, 1958, in the Texaco gas station at St. Peter, which plaintiff had operated since 1955. The evidence introduced at the trial is considered in the light most favorable to plaintiff, as it must be, in the following statement of facts.

An overhead unit space heater was suspended from the roof of the gas station about 8 feet above the floor near the south wall of the station's service area and near to the southwest corner thereof. This heater burned natural gas supplied by defendant gas company. It was not owned by plaintiff or defendant but was part of the premises leased by plaintiff. This heater supplied heat, carried through ductwork bolted to the face of the heater, to the office and to the men's and ladies' restrooms. The heat was blown through the ductwork by an electric fan built into the heater. The areas of the station so heated

were partitioned from the service area of the station by plastered walls constructed of 2″ by 4″ studs. The ductwork from this heater entered the office area through the wall near the ceiling and was held in place within the wall by a framework constructed of 2″ by 4″ lumber. The opening itself was 6″ by 14″. The duct opening in the office was covered with a metal grill-like cover common to hot-air heating systems. Duct openings leading to the restrooms were similarly constructed through similar walls. A thermostat located in the office controlled the operation of the heater during its normal operations. On the west wall of the service area was an electrical switch, operated manually, which when turned in the "off" position would normally break the circuit to the heater and would cause it and the fan which dissipated the heat to cease operating.

The flow of natural gas into the heater from defendant's pipelines inside the building was regulated by two valves. One valve was manually operated and the other was an automatic valve which opened and closed as the thermostat called for heat, operating on the principle of an electromagnet. When the thermostat called for heat, it would close the electrical circuit to the heater and a small electromagnet within the "automatic" valve would pull up a plunger blocking the gas line and admit gas to flow to the heater. When the demand for heat ceased, the thermostat would break the electrical circuit, demagnetize the electromagnet, causing the plunger to drop back into the gas line, and thus shut off the flow of gas to the heater.

While there was also another heater heating the service area, it had always functioned properly, and no claim is made that it caused the fire so all references hereafter will be to the heater heating the office and restrooms.

On October 2, 1958, plaintiff's employee, Robert Von Essen, opened the service station at about 7 a. m. He then found that some material in a box which had been resting on the ductwork had caught fire and that the station was very hot. The gas company was called immediately and defendant's employee, Stanley R. Wolfe, answered the call. It was the usual business of defendant to make service calls and to repair appliances for its customers. Von Essen's call to the gas company was noted on a company complaint sheet which was completed

by Wolfe after he had investigated plaintiff's complaint. The complaint sheet is in evidence. Wolfe found that the plunger in the automatic valve had "stuck" in the open position.

On October 15, 1958, Von Essen advised plaintiff that the heater had again "stuck" and the gas company was called and the heater checked.

On October 25, 1958, a customer, after going into the men's restroom, reported to one of plaintiff's employees that the room was very hot. The gas company was again called and did some work on the valve. No complaint sheets for the calls made on October 15 and October 25 were produced at the trial. Wolfe testified, however, that it could easily happen that no complaint sheets had been made out.

On November 7, 1958, another call was made at the service station by the gas company in response to a complaint. It was discovered at the time that a pin had fallen into the thermostat, apparently from a map on the wall above, shorting the circuit. The pins in the map were subsequently removed by plaintiff and there is no other evidence of any defective operation of the thermostat either prior to or subsequent to that one occasion.

On the morning of November 15, 1958, the heater again became overheated. Defendant was called and Wolfe came to the station between 2 and 3 o'clock in the afternoon and again investigated the heater. He made the same discovery as previously—that the plunger in the automatic valve had "stuck" in the open position and refused to drop back into the closed position when the electric current was shut off. He made the same type of repairs as he had made on October 2, taking the valve apart, cleaning it, and putting it back together again. Wolfe advised plaintiff then that the valve was "shot" but that he would come back on Monday, November 17, to replace it. He instructed plaintiff that in the meantime, when he was ready to close the station, he should turn the electrical switch to the "off" position and then stand underneath the heater and listen to see if he could hear the heater burning. If he could, then he should turn off the manual valve, and if he could not hear it, he should leave the switch in the "off" position. Whether prior to this time plaintiff had ever attempted to determine if he could hear the heater burning does not appear.

Wolfe knew that it would be dangerous if the valve should "stick" in the open position during the night, when no one would be present, and that there could be danger of fire if it should do so. At the trial plaintiff's attorney read a question, which had been asked in a pretrial deposition, as to whether there would be a danger that the heater might overheat if a valve were to stick at night, to which Wolfe responded: "That is correct." He further testified:

"Q. And that the danger that would be presented if that heater did overheat would be such that it might cause a fire. Isn't that true?
"A. That is right, it might."

On Saturday night, November 15, and again on Sunday night, November 16, plaintiff did what he had been instructed to do, and to the best of his knowledge the heater was off. On Monday morning, November 17, the heater was again overheating. Plaintiff and Von Essen discussed the matter and decided that Von Essen should stop at the gas company during his lunch hour if the gas company employees had not replaced the valve by that time. Von Essen went to the gas company about 2 p. m. Wolfe was out, and Von Essen talked with Dennis Peterson, another employee in defendant's service department. Peterson promised that he would check whether the company had the needed valve and stop in the same afternoon. Peterson stopped at the service station about 3:30 that afternoon and said that he would see if he could get a replacement valve from Mankato and would stop back later to install it. Valves of the type needed were stocked at defendant's office at Mankato. Peterson did not return with the valve that afternoon, nor did any other member of defendant's service department put in an appearance. The fire occurred in the station that night about midnight.

The jury returned a verdict for plaintiff for $7,700. Defendant moved for judgment notwithstanding the verdict and the motion was denied. It appeals from the judgment entered thereafter. The principal issue raised on appeal is whether the evidence supports the verdict of the jury on the issues of negligence, proximate cause, and contributory negligence. The amount of the damages is not in dispute.

Defendant makes the following assignments of error: (1) The

trial court erred in failing to grant its motion for judgment notwithstanding the verdict; (2) the trial court erred in failing to grant its motion for a directed verdict made at the close of the evidence.

Defendant contends that there is no evidence to show that the fire was caused by escaping gas from a defective magnetic shut-off valve on the heater and that in any event plaintiff was himself guilty of contributory negligence as a matter of law. Defendant further contends that the valve in question was found in a closed position the morning after the fire and that therefore the fire could not have been caused by overheating of the heater; that plaintiff's entire case depends upon a finding by the jury that the magnetic shut-off valve controlled by the switch located on the west wall of the building failed to shut off when plaintiff turned the switch to the "off" position upon leaving the station, a theory which defendant contends the evidence does not support.

The testimony is clear that when plaintiff closed the station on each of the evenings of November 15, 16, and 17 he turned off the electric switch in accordance with instructions given by Wolfe, and it is also clear that so far as plaintiff could determine, following the instructions given him, the magnetic valve closed on each occasion. Defendant argues that even if the fire occurred in the manner claimed by plaintiff, the evidence fails to establish that negligence of defendant proximately caused it; that if there was evidence that the valve had failed to close there was no evidence of the cause of such failure so as to establish negligence on the part of defendant.

Plaintiff, however, contends that the jury could reasonably have found that the activities of defendant during the period beginning October 2, 1958, and extending to midnight on November 17, 1958, when the fire occurred, constituted negligence in several important respects; that, for instance, defendant was negligent in not shutting off the gas supply on November 15, when it had determined that the valve was worn out and had to be replaced, and again on November 17, when defendant failed to replace the valve on that day as agreed, knowing that the valve was in a defective and dangerous condition. Defendant had found the valve stuck in open position on October 2, October 15, October 25, and November 15, 1958, had undertaken its repair on each of those dates, and finally on November 15 had reached the

determination that the valve was worn out and would have to be replaced and agreed to replace it on Monday, November 17, the day of the fire. Plaintiff contends that the ineffectiveness of the earlier repairs was a clear warning to defendant that the repairs made November 15 would not be adequate and that the defective valve was then in a dangerous condition and should be replaced. Plaintiff also claims that, when his employee informed defendant in the early afternoon of November 17 that the heater had failed to shut off that morning, defendant had double notice that the repairs made on November 15 were not adequate.

Von Essen testified to the following conversation between Wolfe and plaintiff:

"Q. Yes, and did you hear any conversation between Mr. Wolfe and Mr. Trimbo or any conversation in which you may have been immediately present regarding the heater that morning or that day [November 15]?

"A. Well, he was working on the heater and when he was about to leave, I remember he remarked that the valve was shot, and that it should be replaced, and that he would be up Monday morning."

There was other similar testimony. The complaint sheet prepared by defendant, which was admitted in evidence, discloses the agreement made on November 15 regarding replacing the valve:

"Found Valve stuck open. Got valve working again. Told Trimbo valve should be changed but could not do it till first part of next week. He said O.K."

The following testimony by Wolfe relates to his reason for giving instructions to plaintiff to shut off the switch and go and stand under the heater and if he heard it burning to "turn off the manual valve, but otherwise * * * not to turn off the manual valve, if in his opinion it [the heater] was off."

"Q. And referring to page 15 of that deposition the question was asked, 'Why did you give those instructions?

" 'Answer: Well, actually, to make sure there would be no—to make sure that the valve did not stick during the night with the switch

off, that it couldn't actually stick during the night when no one was present.

" 'Question: You felt that if it did stick during the night that there was some reason why it wouldn't be a good thing.

" 'Answer: Just that there would be nobody present, I couldn't tell you what would happen but it is just not a good thing to have a valve stick at night when no one is around.

" 'Question: Mr. Wolfe, I ask you, the reason it is not just a good thing to have a valve stick at night when no one is around is because there is a danger that the valve, or that the heater might overheat. Isn't that true?'

"A. That is correct.

"Q. And that the danger that would be presented if that heater did overheat would be such that it might cause a fire. Isn't that true?

"A. That is right, it might.

"Q. And so that is the reason then that you gave him those instructions?

"A. That is the reason I gave him those instructions. That is right.

"Q. And that is also the reason, isn't it, that you told him you would come back the first part of the week and replace this valve, isn't it?

"A. Not the entire reason.

"Q. Is it part of the reason?

"A. Part of the reason.

"Q. You felt there was some concern about this valve, isn't that true?

"A. Yes, I did."

Defendant contends that, if there was a hazard which could result from the failure of the magnetic valve to close, plaintiff was guilty of contributory negligence as a matter of law; that plaintiff knew of such hazard and knew that it could have been avoided by the simple expedient of turning a reasonably accessible manual valve. Plaintiff, however, claims that his conduct was that of a reasonably prudent man, pointing out that on all occasions when the heater appeared to be operating improperly he called defendant to make repairs and that

he followed the instructions defendant gave him to the best of his ability.

The fire occurred on the night of November 17. That it resulted from overheating of the heater which had been operating improperly can hardly be disputed since the record discloses that this heater was bulged and bent, burned to a white color on the top as from intense heat; that this heater had to be replaced after the fire; that the studs in the wall next to it which separated the service area from the rest-rooms were all charred and burned at the level of the heater itself, but not at a lower level; that the only area of the roof which required repairs and replacement was immediately above this heater; that tar had melted from the roof and had run down the outside of the building from the same area; that shelves were burned and destroyed in the same area; that the studs in the wall immediately adjacent to the heater were badly damaged; and that in combating the fire the fire department found it necessary to direct its hoses toward the area in which the heater was installed. The chief of the fire department testi-fied that after the fire the plaster around the ductwork opening into the office, which was 10 feet from the heater, was intact, but that it was discovered later that all of the 2″ by 4″ lumber which held this piece of ductwork in place inside the wall had been charred and burned. This evidence is significant because it indicates that the only way that the ductwork framing could have become charred and burned inside the wall, without the wall being otherwise damaged, would have been by intense heat generated through the ductwork. The only place from which the intense heat could have come was the heater.

Defendant relies largely on testimony that the valve was found to be closed after the fire. The value of that testimony, however, is mate-rially reduced by the testimony of the firemen that in combating the fire they directed their high pressure hose at the area in which the heater stood, used a pike pole to pull and tear off the ductwork from the heater, thus jarring and bumping the heater. The jury could rea-sonably infer from these facts that the valve closed during the process of putting out the fire.

Plaintiff contends that defendant should have turned off the gas as soon as it discovered the existence of the faulty valve requiring re-

placement; that defendant's failure to replace the valve either before or on November 17 constituted negligence; and that such negligence proximately caused the fire and the resulting damage to the station.

■ Defendant cites Bellefuil v. Willmar Gas Co. Inc. 243 Minn. 123, 66 N. W. (2d) 779, as authority for reversal in this case. In the Bellefuil case this court affirmed a judgment notwithstanding the verdict, the sole issue being whether or not a gas company had sufficient notice of a dangerous condition of a gas heater. Certainly that ruling cannot be said to apply in this case since defendant had made repairs in response to several calls and had assumed the replacement of the defective valve but had failed to do it on the appointed day and, with knowledge of the dangerous condition of the valve, had failed to shut off the gas on November 15 and to keep it shut off until the replacement was made. All of these facts furnish proof that adequate notice had been given defendant of the existence of the defective condition. In the Bellefuil case the only question on appeal was whether the defendant gas company could be found negligent under the facts therein. This court in that opinion said that in the absence of some contract, custom, or statutory obligation a gas company has no duty to make periodic inspection of gas appliances in a customer's building where they are not installed, owned, or controlled by the gas company; that under those circumstances the company can act upon the assumption, in the absence of notice to the contrary, that the customer's appliances are in repair so as to permit the transmission of gas therein with safety; and that in the absence of a contrary showing it is the responsibility of the customer to maintain and repair his appliances. But we also said (243 Minn. 127, 66 N. W. [2d] 783):

"* * * If, however, a gas company acquires, or ought reasonably to have acquired, knowledge of a dangerous condition, it is its duty to shut off the gas until the customer has his pipes, connections, and appliances properly repaired."

See, Jelf v. Cottonwood Falls Gas Co. 162 Kan. 713, 178 P. (2d) 992.

The rule with respect to leaks from appliances of a customer was stated as follows in the Bellefuil case (243 Minn. 127, 66 N. W. [2d] 783):

"A gas company is guilty of negligence if a leak in a customer's pipes and appliances causes injury to persons or property, provided the company has sufficient notice of such leak or leaks, and having such notice (*a*) negligently inspects or negligently repairs; (*b*) agrees and assumes to inspect and repair, and then fails to do so; (*c*) *refuses to inspect and repair, knowing a dangerous condition exists, and with such knowledge fails to shut off its gas until the owner can have his pipes and appliances properly repaired.*"

In that case this court adopted the rule that (243 Minn. 128, 66 N. W. [2d] 783):

"* * * whenever a gas company is in possession of facts that would suggest to a person of ordinary care and prudence that an appliance of a customer is leaking or is otherwise unsafe for the transportation of gas, the company has a duty to investigate, as a person of ordinary care and prudence similarly situated and handling such a dangerous substance would do, before it continues to furnish additional gas. The duty to exercise reasonable diligence to inspect or shut off the gas supply is measured by the likelihood of the injury. Circumstances may be such as to require a gas company to investigate immediately and shut off the gas supply until repairs are made. The nature of the notice may also affect the extent of inspection necessary.

*   *   *   *   *

"* * * But the duty, by reason of actual or constructive notice of some dangerous condition, must arise before the gas company can be found negligent for its failure to inspect or shut off the gas supply."

The jury here could, as it undoubtedly did, direct its inquiry to the whole of the evidence relating to the fire and its probable cause and draw any reasonable inferences therefrom, even though the evidence submitted pertaining to the origin of the fire was of necessity circumstantial since no one was present when the fire commenced. The cause under the circumstances disclosed by the evidence became, we think, a question for the jury. The evidence with respect to the origin of the fire, although circumstantial, took that issue out of the realm of speculation and conjecture, and provided a basis for drawing reasonable inferences as to the cause of the fire and lent ample support to a

finding that defendant's negligence did in fact proximately result in the fire. Where, as here, there is no direct evidence as to how the fire actually began, circumstantial evidence may be relied upon. See, Arena Co. v. Minneapolis Gas Co. (8 Cir.) 234 F. (2d) 451; McClure v. Hoopeston Gas & Elec. Co. 303 Ill. 89, 135 N. E. 43, 25 A. L. R. 250; 24 Am. Jur., Gas Companies, § 58.

■ The circumstances have been proved, we think, in the instant case, to the extent that reasonable minds functioning judicially might well be able to conclude from them that the theory adopted by the verdict outweighs and preponderates over any other theory. In civil cases a party need not prove his theory beyond a reasonable doubt nor demonstrate the impossibility of every other reasonable hypothesis. As to the degree of proof required in civil cases to warrant recovery on circumstantial evidence, see Sherman v. Minnesota Mutual Life Ins. Co. 191 Minn. 607, 255 N. W. 113; Hagsten v. Simberg, 232 Minn. 160, 44 N. W. (2d) 611; Meyers v. Minneapolis, St. P. & S. S. M. Ry. Co. 168 Minn. 122, 209 N. W. 892.

■ It is not necessary that there be eyewitnesses of defendant's conduct to prove negligence since, like any other fact, it may be proved by circumstantial evidence; i. e., evidence of a fact or a set of facts from which the existence of other facts may be reasonably inferred. See Prosser, Torts (2 ed.) § 42, where the author also points out:

"* * * It [circumstantial evidence] involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference, by which a conclusion is drawn."

See, Hill v. N. P. Ry. Co. 210 Minn. 190, 297 N. W. 627; Jensen v. Linner, 260 Minn. 22, 108 N. W. (2d) 705.

■ The court in Arena Co. v. Minneapolis Gas Co. (8 Cir.) 234 F. (2d) 451, 457, said:

"* * * the trier of the facts * * * was concerned with whether the plaintiffs had sustained their burden of proof by fair preponderance of the evidence that the fire started at heater No. 1, and that the fire was a proximate result of negligence on defendant's part. * * * This is peculiarly the prerogative of a jury. * * * We will examine

the possibilities only in accordance with the policy of viewing the evidence in a light most favorable to the prevailing party * * *."[1]

■ There is ample testimony in the record from which the jury could reasonably find that the gas company had agreed to make repairs at a stated time and then negligently had failed to do so. In this connection the question also arises whether defendant was negligent in giving plaintiff the instructions it did concerning the continued operation of the heater. It had a duty, upon the state of the record, to turn off the gas until the defective valve was replaced if, taking into account the delay in replacement, the danger warranted such action. It was within the prerogative of the jury to consider these instructions in connection with the other evidence and especially the evidence as to the manner and method of inspection and repairs. The reasonableness of the methods pursued in making repairs and replacement of the defective valve presented fact questions for the jury.

■ We have repeatedly said that, generally, the question of contributory negligence is one of fact for the jury and that it is only in the clearest of cases when the facts are undisputed and it is plain that reasonable minds could not draw different conclusions that it is one of law for the court. Aubin v. Duluth St. Ry. Co. 169 Minn. 342, 211 N. W. 580. As stated in 13 Dunnell, Dig. (3 ed.) § 7033:

"* * * It is only where the evidence of contributory negligence is so clear as to leave no room for an honest difference of opinion among reasonable men that the court can enter upon the province of the jury and direct a verdict for the defendant."

See, 24 Am. Jur., Gas Companies, § 63.

■ Defendant vigorously asserts that plaintiff was guilty of contributory negligence in carrying out the instructions given him by defendant's repairman for determining when the heat was off and when it was on. Plaintiff was, of course, contributorily negligent if he failed to exercise "the care which persons of ordinary prudence exercise under the same or similar circumstances." 13 Dunnell, Dig. (3 ed.)

[1]McClure v. Hoopeston Gas & Elec. Co. 303 Ill. 89, 135 N. E. 43, 25 A. L. R. 250; 24 Am. Jur., Gas Companies, § 58.

§ 7012. We think that the issue of contributory negligence was for the jury.

Had defendant shut off the gas on Saturday, November 15, when it was clearly its duty to do so, plaintiff would never have been required to follow these instructions on the nights of November 15, 16, and 17. If defendant had replaced the valve on November 17, as it had promised to do, plaintiff would not have been required to try to protect his property by following a set of instructions that the jury could well find had been negligently given.

■ Plaintiff notified the gas company on Monday, November 17, that the heater was not working properly, practically demanding replacement of the valve on that day. He relied upon the superior knowledge of defendant's representatives and believed that they knew what they were doing. We think the following rule stated in 38 Am. Jur., Negligence, § 69, is applicable:

"The general rule is that whoever acts negligently is answerable for all the consequences that may ensue in the ordinary course of events, even though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer."

Plaintiff testified as to the instructions he was to follow when closing the station on November 15, 16, and 17:

"A. He told me to—at night to go over and throw the main electrical switch and after I had thrown that switch I should then walk underneath the heater and listen, to the best of my knowledge—I mean, that I would listen, walk over there and listen to see if I could hear any gas burning, and I should then turn the main valve off, but if it sounded okay, I should leave it as it is and then they wouldn't have to come up the next day."

As to his actions on Monday night, at the taking of the pretrial deposition, he testified:

"Q. And did you close up that night?

"A. I went in and checked the heater, I didn't close up, I checked the heater.

"Q. Tell me what you did in that regard.

"A. I turned the switch and walked over underneath, and I am no authority on it, but to the best of my knowledge it wasn't burning. It apparently was, but I just walked away, because it had done just the same as the other two previous nights when I checked it."

At the trial he testified that he had given these answers.

We think the record presents credible evidence, both direct and circumstantial, from which the jury could reasonably find that the defendant gas company was negligent in several respects, that such negligence proximately caused the fire resulting in damage to plaintiff, and that plaintiff was not contributorily negligent. These fact questions, it appears, were properly submitted to the jury and its determination of them was properly sustained by the trial court upon motion for judgment notwithstanding the verdict.

Affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.