## RICHARD RAYMOND AND OTHERS v. E. J. BAEHR AND OTHERS.

163 N. W. (2d) 54.

December 6, 1968—Nos. 41031, 41032.

*Meagher, Geer, Markham & Anderson, G. T. MacIntosh II*, and *O. C. Adamson II*, for appellant..

*Nolan, Alderman, Holden & Breen*, for respondent plaintiffs.

*Ryan, Ryan & Ebert* and *Thomas Ryan*, for respondent defendants.

Heard before Knutson, C. J., and Nelson, Murphy, Peterson, and Frank T. Gallagher, JJ.

PETERSON, JUSTICE.

On December 28, 1964, a fire occurred in a building constructed and owned by defendants E. J. Baehr and M. S. Baehr, known as the Baehr Building, in Brainerd, Minnesota. Defendant Bonita Amusement Company, Inc., hereafter referred to as Bonita, was the prime lessee of the Baehr Building and was responsible for the repair and maintenance of the building. Actions were brought by the sublessees who sustained property damage and the employee of the lessee who suffered personal injuries from the fire and explosion. The cases were consolidated for trial. The damages in each case have been stipulated. The only issue submitted to the jury was that of liability for the fire, that is, whether the origin of the fire, or the spread of the fire irrespective of its origin, was due to the negligence of defendants.

The jury returned verdicts against defendant Bonita only, and Bonita appeals from the judgments. The sole issue raised for consideration in this opinion [1] is whether the evidence is sufficient to sustain a finding of any negligence on the part of Bonita in connection with the damaging fire.[2]

---

[1] The jury exonerated defendants E. J. Baehr and M. S. Baehr, and plaintiffs appealed from the order denying their subsequent motion for a new trial. Disposition of that appeal (No. 40966) is the subject of a separate opinion, Raymond v. Baehr, 282 Minn. 109, 163 N. W. (2d) 51, but such decision, as later noted, affects the disposition of the instant appeal.

[2] Because a large-scale, destructive fire tends to consume the evidence of its origin, it is inherently difficult to establish with certainty that it was

Twin causes of fire damage, both attributable to the negligence of defendant Bonita, are asserted by plaintiffs. First, that the fire *originated* in the negligently maintained incinerator system of the building, either from fire escaping from its defective burning chamber and igniting combustible material on the floors directly above it or from intense heat in its deteriorated flue igniting a wood meter cabinet adjacent to it on the second floor. Second, that regardless of such origin the fire's damaging *spread* was due to three other negligent acts or conditions for which Bonita was responsible: A recurring prevalence of smoke from the defective incinerator system lulled the plaintiffs into complacency concerning the hazard of an existing fire; Bonita's caretaker, in opening the door to the meter cabinet, then engulfed in flames, permitted the fire to burst out into general conflagration; and Bonita had its own responsibility for permitting the existence of a wood-framed ventilation duct, negligently constructed by defendants Baehr, along which the fire traveled across the building to the point where the building exploded.

The principal problem in the case is whether, notwithstanding the jury's implicit finding that defendant Bonita was negligent, the evidence sufficiently supports an inference that such negligence caused the fire to occur.[3] We accordingly focus on those facts, necessarily abbreviated,

---

caused by negligence or the negligence of particular persons; inferences must necessarily be drawn from circumstantial evidence. The inferences must, nevertheless, be reasonably supported by the available evidence; sheer speculation is not enough, and the inference of negligent causation must outweigh contrary inferences. See, Rademacher v. Pioneer Tractor Mfg. Co. 127 Minn. 172, 149 N. W. 24; Silver v. Harbison, 178 Minn. 271, 226 N. W. 932; Trimbo v. Minnesota Valley Natural Gas Co. 260 Minn. 386, 110 N. W. (2d) 168.

[3] We cannot determine whether the jury found only that the fire *spread* as a result of Bonita's negligence, but the thrust of the evidence and argument was apparently directed mainly to the *origin* of the fire. The verdict exonerating defendants Baehr of any liability indicates, of course, that the jury likewise attributed no fault to defendant Bonita in connection with the wood ventilator system; but our decision in plaintiffs' companion appeal with respect to that issue reopens the question on retrial. The claim that prevalent smoke conditions in fact precluded plaintiffs from protecting themselves from damage seems untenable under the evidence. Any finding that the act of the

that most favorably and relevantly might support an inference that defendant Bonita's negligence caused the fire to occur.

The Baehr Building was a three-story structure which, with the exception of exterior walls and masonry floors and firewalls on the first floor, was constructed primarily of wood. It was equipped with an inside incinerator system, located toward the west end of the building. The burning chamber of the incinerator was in the basement and its flue rose vertically through the building to the roof. On each of the three floors there was a small door to the incinerator flue, into which tenants dropped combustible trash to the burning chamber below. Adjacent to the flue, on the second floor, was a meter cabinet made of wood. At the top of the flue was a wire screen to trap materials rising from the burning chamber.

The incinerator system, as the jury could find, had not been adequately maintained. Its burning chamber was obviously defective, for brick had fallen from the upper part of the burning chamber, creating an 8-by-10-inch opening at the upper rear wall of the chamber, and examination after the fire revealed that some of the brick inside the chamber was cracked. The interior of the burning chamber and flue had never been inspected, and no repair work had been performed upon the system in 11 years. Its flue was deteriorated as far as an observer could see above the level of the basement ceiling; the brick lining of the flue, which was not constructed of firebrick, was about 2 inches less thick than the 12-inch thickness indicated in the original blueprints. There was, however, no direct evidence of any break in the flue at the second-floor level. There is a strong inference that the wire screen atop the flue may have been clogged, for, although it was necessary for the caretaker to clean the flue out about once a month to avoid backup of smoke into the building, it had not been cleaned in 2 months and a smoky condition had existed in the building for some hours prior to the fire. The jury could find, further, that the place of the fire's origin was somewhere in the immediate area of the incinerator system below the third floor of the building.

---

caretaker in opening the door to the meter cabinet was either negligent or, if so, the sole cause of the fire's spread would be rather tenuous.

The question of reasonable inference narrows to whether the jury could infer that fire in the incinerator system ignited combustible material in that area adjacent to it. Fire of intense heat, as the jury could find, had existed in the incinerator on the day of the fire. Due to the Christmas weekend there was an unusual amount of trash for incineration, and it was burned by Bonita's caretaker from about 9 o'clock until about 10 o'clock in the morning. There was evidence, including charred wires above the burning chamber, from which a jury could find that intense heat or flame escaped through the hole in the burning chamber. The ultimate inference, the difficult one in this case, would be that this heat or fire was transmitted to the second floor—more precisely, to the meter cabinet—where the fire was discovered in full flame at 2 o'clock in the afternoon, a little more than 4 hours after the morning's trash burning. Plaintiffs tendered three theories to the jury at various stages in the trial, each of which requires brief analysis.

First, plaintiffs suggested that the fire was transmitted either by way of three pipe "chases" in the basement ceiling, through which pipes passed to two bathrooms and into a wall on the floor just above, or by way of the holes through which telephone wires passed to the floors above. Notwithstanding charring of insulation on the telephone wires, the charring occurred about 2 feet below the holes; there was, more importantly, no evidence of burning in any of the chases or any indication that the fire first occurred in the bathrooms. The theory that these were the avenues by which the fire occurred on the second floor has virtually no support in the record.

Second, plaintiffs originally gave primary emphasis to the theory that fire escaping from the incinerator chamber ignited a false wall attached to a masonry partition wall in the Christian Science Reading Room, premises of a sublessee located on the first floor immediately above the incinerator chamber. If so, it would be reasonable to infer that the fire traveled up that wall to the meter cabinet, the floor of which was adjacent to the top of the false wall. Although the fire chief testified to the existence of charred plaster and studs on the wall in that location, all other evidence strongly indicated that no such false wall existed. The physical evidence, more importantly, tended to rebut the inference that

such wall, even if it existed, would have been ignited from a fire in the basement, for the basement ceiling was made of poured concrete, 6 inches thick, and, in addition, the intersecting masonry wall of the first floor could have added as much as 13 inches of intervening masonry and plaster. Plaintiffs themselves, as presently noted, abandoned that theory at the conclusion of the testimony.

Third, plaintiffs theorized that heat from the incinerator *flue* at the second-floor level ignited the wood in the adjacent meter cabinet. It is not improbable that intense heat in the flue itself could have ignited the wood in the meter cabinet, if it could reasonably be inferred that there was intense heat either from a column of heat standing in the flue from the unusual amount of trash burned in the incinerator chamber below or from trapped trash burning in the adjacent flue itself. There is evidence that the metal incinerator door on the second floor was hotter than usual, and the presence of smoke in the upper floors was "a little stronger" than usual. Although this theory is made the more plausible by the absence of evidence as to any other source unrelated to Bonita's negligence, we nevertheless consider, in the absence of more evidence directed to this theory, that it is at best a marginal inference.

Plaintiffs' final argument itself underscores the uncertainty of their various theories of the fire's origin:

"Could it be that the incinerator wall at the second floor level, not being made of fire brick, was a conduit with sufficient enough intensity of heat in it to char or start burning something on the other side of it? As I say, you can use your circumstantial evidence in this case to come to any reasonable conclusion, any reasonable inference, and I submit to you that there cannot be another explanation.

"I just have thought about this over two years now, and I have finally concluded in my own mind that the circumstantial evidence in this case has to be that way. Now, certainly, we are now aware of the fact that it could not have climbed up the wall of the Reading Room. I will admit this.[4] It could not have climbed up that wall, but I say that it doesn't

---

[4] This was not an unguarded concession, moreover, for in chambers, prior to final argument, plaintiffs' counsel stated: "I will say this much, that

have to climb that wall because if that incinerator is so hot on the second floor, that Al Nelson found it hot to his touch, it is submitted that it was hot enough to burn the area around the chimney, but the thing about it is despite the fact—excuse me. Regardless of what the origin of the fire is, that the destruction and chaos to these folks wouldn't have happened unless that wooden ventilating shaft had been there. If it would have been properly constructed, it would not have spread; it just would not have spread."

The jury had before it, then, a multiplicity of theories as to the origin of the fire and theories as to the spread of the fire, at least some of which were untenable and one of which was abandoned by plaintiffs. Yet, under its general verdict, we are unable to ascertain upon what basis the jury found that defendant Bonita was negligent and that such negligence was the cause of plaintiffs' damage; indeed, plaintiffs' final argument invited the jury to speculate merely that something, somewhere caused a fire for which said defendant was responsible, and the trial court, in sustaining the verdict, adverted in part to theories we have indicated are untenable.[5]

---

I am making no claims that it came up this [Christian Science Reading Room] wall."

[5] The memorandum attached to its order denying Bonita's motion for judgment notwithstanding the verdict stated: "* * * While the evidence adduced does not of necessity conclusively support the verdict, yet it must of necessity appear that in cases of this kind, such absolute evidence is almost never obtainable. Circumstantial evidence was presented along with the other evidence in the case which in the opinion of this Court well justified the jury in finding negligence against the caretaker of Bonita, which negligence was a proximate and direct cause of the fire and its progress.

"Factors which the jury might well have had in mind among others include: that in a climate like ours spontaneous combustion does not usually occur during the Christmas season, an abnormal amount of Christmas waste accumulated on the premises immediately before the fire and was burned in the incinerator the morning of the fire, the incinerator was not in the best condition, heat developed in the wall above the incinerator after the burning and immediately before the fire, and the caretaker opened the box on the 2nd floor against the advice of the witness Alfred Nelson with a resulting rush

A new trial should be granted where it cannot be determined whether the jury's verdict was based upon a valid or invalid theory of negligence. Ohrmann v. Chicago & N. W. Ry. Co. 223 Minn. 580, 27 N. W. (2d) 806; Namchek v. Tulley, 259 Minn. 469, 107 N. W. (2d) 856. A new trial is appropriate, moreover, in view of our grant of a new trial upon plaintiffs' appeal from the judgment for defendants Baehr, for to the extent that plaintiffs' claim against each defendant is predicated upon the construction and maintenance of a wood ventilating shaft a perverse result might otherwise occur if judgment against defendant Bonita were reversed without a new trial.[6]

Reversed and new trial granted.

---

of fire followed shortly thereafter by a general conflagration of the building and explosion, and the fire chief's testimony as to burned embers in wall of Reading Room near the wall of the incinerator."

[6] Although we do not base decision on other grounds, there is authority for granting a new trial where causation is in doubt and there is a probability that other competent evidence may be available to make the finding less tenuous. See, Routh v. Routh, 256 Minn. 203, 97 N. W. (2d) 644. See, also, Emerson v. Hennessy, 47 Minn. 461, 50 N. W. 603, and Yager v. Held, 186 Minn. 71, 242 N. W. 469.