FREDERICK L. TAYLOR v. ESTELLA I. TAYLOR.[1]

May 10, 1929.

No. 27,263.

[1]Reported in 225 N. W. 287.

*Edgerton, Dohs & Edgerton* and *Fred L. Doud*, for appellant.

*Davis, Severance & Morgan* and *North, Parker, Bie, Duquaine, Welsh & Trowbridge*, for respondent.

WILSON, C. J.

Plaintiff appealed from an order denying his motion for a new trial. The action is for divorce on the ground of desertion and cruel treatment.

The parties were married in 1916. They have two children. The wife had $3,500 and household furniture. The first year was spent in Minneapolis. Then they moved to St. Paul into a house financed with her money. The wife later inherited about $1,000. The husband worked for his father in a manufacturing plant for about $125 per month. In 1919 they sold the house netting them about $2,000 and moved to Seymour, Wisconsin, where the money was invested in an automobile business with the wife's uncle. There the husband drew about $150 per month. In February, 1920, he sold receiving $2,500. He then took the local agency for the Studebaker car and was unsuccessful. He next was unsuccessful in the operation of a gasolene filling station. The funds so furnished by defendant were exhausted. In July, 1921, they left their debts in Seymour, incurred for living expenses, unpaid and moved to Green Bay, Wisconsin, where plaintiff engaged in the insurance business. He did not make expenses. Defendant took in roomers. She also pledged her jewelry for $500. There has been no redemption. At Green Bay plaintiff had various automobiles at different times, a Maxwell, a Jordan, a Rickenbacker, a Moon and a Ford. His indebtedness increased. He owed apparently $3,000 to insurance

companies for premiums on policies delivered. This item was apparently paid by plaintiff's father. Defendant was continually worried by creditors.

December 1, 1926, plaintiff left Green Bay and returned to St. Paul. He left his family in Green Bay with unpaid rent, grocery and other bills. He returned to his family at Christmas and again in February, 1927. When he came to Minnesota on December 1 it was the understanding that he was to re-establish himself and demonstrate that he was able to support his family and then the family would come to him. But he did not succeed in St. Paul. He left an unsuccessful insurance business here and returned to his father, who put him on the payroll apparently as a matter of gratuity. He has since remained with the father. He now owes his father $3,000 and owes $2,000 to others.

When plaintiff left Green Bay December 1, 1926, he left about $15 with his wife. He furnished her $10, $30, and $6 in that month. In January, 1927, he sent her $23; in February, $10; in March, $250, of which $175 was paid on past due rent. Remittances then ceased. In the summer of 1927 the wife and children became destitute, and their necessities were furnished by others. She sought and found work and has used reasonable effort to support herself and children.

In August, 1927, defendant caused plaintiff to be arrested on a charge of nonsupport. Then for six months defendant was paid $75 per month through plaintiff's attorney. He also sent her $30 extra in October, 1927.

Soon after December 1, 1926, plaintiff asked defendant to come to St. Paul with the children and live with him. She conditionally refused. She reminded him of his inability to support his family and insisted that he must demonstrate that he could do this and if so she would come and live with him. This request and conditional refusal were repeated. Plaintiff's father wrote letters to defendant urging her to come to St. Paul and live with plaintiff. The father also tendered financial help. The only trouble between plaintiff and defendant seems to be his shiftlessness and inability to support his family by his own efforts.

■ Plaintiff claims defendant is guilty of wilful desertion because she did not come to St. Paul and live with him. It is clear that plaintiff was not meeting his own responsibilities by an aggressive assertion of his own activity. If there was shelter and sustenance in St. Paul for defendant and her children it was due to the benevolence of the father. There was nothing to indicate how long this would continue. Ordinarily, perhaps the source of a husband's honorable income is not important. But here there was an unusual situation. Defendant's property which she had confidingly put in plaintiff's hands had disappeared. His efforts were frivolous and ineffectual. The wife and children were facing poverty. She seemed to be trying to get him to stand on his own feet. She wanted him to declare and establish his own independence and cease to depend on his father. Her position in view of the history of the case was not unreasonable.

The claim is that her refusal to come to Minnesota at plaintiff's solicitation constitutes a wilful desertion giving grounds for divorce. The husband has the right to fix the domicile of the family. But there are circumstances in which the wife is justified in making a qualified refusal to acquiesce therein or consent thereto. Each case must stand on its own facts, and we will not attempt to state a rule applicable to all cases. Where a husband tenders a home he must prove its reasonableness both as to place and mode of living. Here the wife's refusal was temporary only. It was conditional upon plaintiff's showing aptitude and ability. A wife should not be subjected to the humiliation of having to rest her support upon the bounty of her husband's relatives. Nor should she be compelled to have her children grow up in that environment. Marriage anticipates an independent home though it may be humble. In this case the wife has demonstrated her ability to work and sacrifice. She was asked to surrender the opportunity of making a living for herself and children and apparently to continue with no hope of improvement. Defendant has been subjected to much sorrow and neglect, and yet at the trial she made no charge against plaintiff but inefficiency. It is reasonable to infer that her absence from

him is a forced and necessary one. Under the circumstances the evidence required a finding that the defendant was not guilty of wilful desertion.

■ The charge of cruel treatment rests largely upon the fact that defendant caused plaintiff to be arrested for desertion and failure to support the children.

Upon plaintiff's own statement he ceased to support upon advice of an attorney, other than his present counsel. From the evidence given on the trial it clearly appears that defendant was not guilty of this charge. Her conduct was not malicious but was at least such as she believed necessary and proper. Her action in this respect was had through the office of the district attorney of Brown county, Wisconsin. It was obviously in good faith. It is also argued that defendant was guilty of such cruel treatment because she charged in an affidavit for temporary alimony that plaintiff had embezzled insurance money. Perhaps she so insinuated. Plaintiff says it is not true. Yet he freely admits that he delivered policies and did not remit the premiums. He admits the indebtedness. Just how he escapes criminal liability is not clear. It is enough to say here that there is sufficient evidence to give her reason to believe that plaintiff was criminally liable. But this accusation was not made with a bad motive but was necessarily brought out in disclosing the history of the case. The evidence sustains the finding that defendant was not guilty of cruel treatment.

■ Appellant by his assignments of error claims that he did not have a fair trial because of bias and prejudice on the part of the trial court.

The trial court participated freely in the examination of the witnesses. He did this more or less on about 50 pages of the 133 pages of testimony. The statement in appellant's brief that the trial judge asked 246 questions of the witnesses is undenied. Counsel suggests that the court took charge of his case and did not permit him to try it in a calm and orderly way. It may have seemed so. Many of the things to which he directed questions would have been developed by counsel had the court's patience permitted. Every

advocate should be given elbow room in the performance of his duty to his client. Counsel not only thinks he was not permitted to submit his evidence in a methodical way but he justly complains of conduct injected into the cross-examination of the defendant, as follows:

The Court: "The only criticism you have of him on that point is the fact that the support wasn't there?

Witness: "Exactly.

The Court: "You have no objections to him?

Witness: "No objections, no. .

The Court: "And I take it from all your letters and all that occurred here that if he had satisfied you in some way that you could rely on him if you came to St. Paul with the children, that he would have a home here and that he would make ends meet, you would have come?

Witness: "That is it exactly.

The Court: "You haven't anything against him?

Witness: "No, sir, I have not.

The Court: "In fact, from most standpoints he is a fine fellow.

Witness: "Aside from his inability, yes.

The Court: "Except what you claim is his inability to earn enough money to support his family?

Witness: "Yes. Shiftless.

The Court: "That is the whole sum of it?

Witness: "That is the whole sum.

The Court: "Will you pardon me for asking that question. I knew I could get at it in two minutes where it might take you 15.

Mr. Edgerton: "Yes, sir. That is on account of superior ability, experience.

The Court: "No, but because—All right, go ahead."

Counsel is judicially known to us as a man of excellent character and legal ability. He stands high. He has had many years of experience. Naturally it would be quite distressing and humiliating to be told in open court in the presence of his client and others that it would have taken him 15 minutes to do what the judge could do in two minutes. He was not in a position to deny the assertion.

For all practical purposes he was helpless. This nonlegal language was unfortunate. It would also seem that the court was getting at the very thing that plaintiff's counsel did not wish to establish. By leading questions which defendant's own counsel could not use the court aided the defendant. It must be that duties between court and counsel are reciprocal. The trial court owes a duty to counsel, who is an officer of the court. A reasonable amount of questions from the court may be helpful. If this is to be done extensively it should be after counsel has completed his examination.

But in the instant case the evidence is so strong as substantially to require the findings made. We do not believe that it is probable that any judge would have found differently. Prejudice to plaintiff himself does not appear.

Affirmed.

[1] Reported in 225 N. W. 295.