**Elsie W. BREMER, Plaintiff,**

v.

**Elliot RICHARDSON, Secretary of Health, Education and Welfare, Defendant.**

**Civ. 71-0-269.**

United States District Court, D. Nebraska.

May 26, 1972.

Ronald K. Parsonage, of Burbridge & Burbridge, Omaha, Neb., for plaintiff.

Robert J. Becker, Asst. U. S. Atty. for District of Nebraska, for defendant.

## MEMORANDUM AND ORDER

RICHARD E. ROBINSON, Senior Judge.

This matter comes before the Court upon cross-motions for summary judg-ment to review the final decision of the Secretary of Health, Education, and Welfare, denying payment of medical benefits for hospitalization provided plaintiff during the period of November 17th, 1969 through January 8th, 1970.

■■■ The review is limited to ascer-taining whether on the whole record there is substantial evidence to support the Secretary's findings. Sullivan v. Finch, 315 F.Supp. 1252 [W.D.Pa.1970]. This standard also extends to any infer-ences and conclusions drawn from the findings. Hoffman v. Ribicoff, 305 F. 2d 1 [8th Cir. 1962]. Of course the Secretary must apply the correct legal standards when resolving the factual is-sues and drawing the inferences there-from. Weaver v. Finch, 306 F.Supp. 1185 [D.C.Mo.1969], or as stated in Celebrezze v. Wifstad, 314 F.2d 208, 210 [8th Cir. 1963]:

> "Judicial review . . . demands that a reviewing court satisfy itself 'that the agency determination has warrant in the record, viewing that record as a whole, and a reasonable basis in law' therefor . . . The performance of that judicial function can only be accomplished by a 'case-to-case consideration' [citations omit-ted]."

The facts of this case are not in dis-pute. The claimant, Elsie W. Bremer, then at the age of 81 years, was admit-ted to a hospital on October 13th, 1969, following a fall. The diagnosis at the time of admission was a fracture of the left hip and chronic degenerative arthri-tis. The fracture was not diagnosed un-til three weeks after the fall because the claimant had not seen a doctor, appar-ently unaware of the serious conse-quences of the fall. After diagnosis, on October 16th, 1969, an operation was performed and a three-inch Massey nail was inserted across the fracture line. The clinical medical aspects of the oper-ation were without incident, but rehabil-itation was arduous.

She was noted to be a frail individual but even so had difficulty since she failed to understand instructions con-

cerning her weight bearing on the hip and had difficulty ambulating. The transcript of the Hearing Examiner provides in part that:

"She proved to be a difficult patient for the nurses to handle in all phases of their treatment. Claimant's rather confused state seemed progressive during her hospitalization, and it was felt that she would be unable to manage herself with a walker until the time at which she was discharged. She was discharged on January 8, 1970, and has been followed since. She has been doing well and now manages to walk with a fair degree of ease." [Tr. 7].

The Hearing Examiner contended that after November 16th, 1969, the level of care was supportive rather than active or therapeutic and that therefore the cost of services beginning November 17th, 1969, should not be paid under the hospital program. The Hearing Examiner stated that:

"Claimant reached a relatively stable plateau on or about November 16, 1969. She was sitting up in a wheel chair at that time. Atlhough she was unable to use a walker or to walk satisfactorily with it until the end of her hospitalization it does not appear that her condition, at least after November 16, 1969, was so severe as to require intensive care. Claimant was on a regular diet; her medication was self-administered, and it appears that although claimant did require assistance in walking, such assistance does not come under the category of specialized physical therapy. The inpatient hospital and extended care admission and billing data . . . indicates an expense of only $36.00 for physical therapy." [Tr. 9].

The government argues that there is substantial evidence to support the decision that the expenses incurred after the period of November 17th, 1969, were excluded from coverage by the express provisions of § 1862 [a] [9] of the Social Security Act [42 U.S.C.A. § 1395y [a] [9]. 1395 [a] [9] provides:

"[No payment may be made for expenses] where such expenses are for custodial care."

"Custodial" is not defined in the Act. The Hearing Examiner applied the following definition of custodial care:

"The question before the hearing examiner is whether skilled nursing services were required or furnished the claimant during her stay at the Brookings Hospital as specified in section 1814 [a] [C] of the Social Security Act, or whether services rendered claimant were custodial care and specifically excluded from coverage under the Act in section 1862 [a] [9].

"The custodial care exclusion precludes payment for that type of care, wherever furnished, which is designed essentially to assist the individual in meeting his activities of daily living —i. e., services which constitute personal care such as help in walking and getting in and out of bed, assistance in bathing, dressing, feeding, and using the toilet, preparation of special diets, and supervision over medication which can usually be self-administered —and which does not entail or require the continuing attention of trained medical or paramedical personnel.

"The basis for determining what is custodial care is the level of care and medical supervision the patient required, rather than such factors as the diagnosis, or the degree of functional limitation.

"Many individuals with a long-term illness or disability reach a relatively stable ·plateau during which their needs may be only for the type of personal care services described above and which could be provided by a nonmedical person in the individual's home if he had a home to go to and someone willing to undertake these responsibilities. These patients would be receiving only custodial care.

"Covered inpatient hospital care is care provided to the acutely ill or disabled who, because of the severity of their condition require the constant

availability of physicians, skilled medical services, and complex equipment ordinarily found in a hospital." [Tr. 8 and 9].

█ The Court takes no real exception to the definition of the terms. Care must be taken, however, not to read the standard with the view towards exclusion of coverage. That is, the mechanical application of literal technical terms could achieve a result not intended by Congress. *See* Sowell v. Richardson, 319 F.Supp. 689 [D.C.S.Car.1970]. The proper approach should be on a pragmatic case to case basis, and should include considerations of the potential consequences which could result from laymen attempting tasks for which they lack proper training.

██ This Court is fully convinced that the Hearing Examiner applied too narrow a reading to his own definition in arriving at his decision, or ignored his own findings of fact without a justifiable basis for so doing.

The record clearly and without contradiction reveals that the medicational aspects of the hospitalization were only secondary, and that the primary purpose of the treatment was to *teach* the claimant to walk again under conditions whereby she would be least likely to reinjure herself.

The Hearing Examiner found that claimant was "unable to walk very well with the walker until toward the end of her hospitalization." [Tr. 9] The Examiner then concludes that assistance in walking did not qualify as specialized physical therapy. This finding is clearly contradicted by his earlier finding that even trained medical personnel were having difficulty teaching the claimant to walk. The fact that her other medical problems had improved such that no "intensive" care was required, that her diet was regular, and that medication was self-administered [Tr. 9] really has no bearing in this case. Furthermore it is not the quantity of care that is critical but it is the *quality* of care and the

possible consequences of the lack of required services that is controlling in this case. If trained medical personnel had difficulty teaching her to walk is it feasible that this task should be entrusted to the unskilled? The fact that an elderly frail person cannot learn as fast as a robust youthful person should not be a negative factor, in fact it is a very significant factor. A second fall could have been disastrous.

█ Assuming *arguendo* that the government's economic argument is controlling it is clear that in this case more expense would be incurred by a fall caused from a premature discharge from the hospital. Moreover the Court cannot believe that such actions would be in keeping with the humanitarian aims of the Act which are of course controlling.

█ The Court finds that the only proper conclusion under the present facts is that the decision is clearly not supported by the facts and that the exclusion should not apply in this case. Although the Hearing Examiner made no findings on other exclusions the government advances 42 U.S.C.A. § 1395y [a] [1]:

"which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

The Court considers the applicability of this exclusion to be wholly without merit on the basis of the facts presented by the record.

The Appeals Council concluded that the Hearing Examiner's decision was correct without advancing any different findings of fact or conclusions than advanced by the Hearing Examiner [Tr. 2]. It follows that the final decision of the Secretary was clearly erroneous as a matter of law. The Court can perceive no proper reason for a rehearing as the record supports only one proper conclusion; the medical benefits for the period in question should have been paid.