William E. WHITMAN, Administrator, etc.

v.

Caspar WEINBERGER, Secretary, Health, Education & Welfare.

Civ. A. No. 487–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 3, 1974.

Benjamin C. Ackerly, Richmond, Va., for plaintiff.

Dennis W. Dohnal, Asst. U. S. Atty., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This action brought by William E. Whitman, as adminstrator of the estate of his late father, William R. Whitman, seeks review of a final decision of the Secretary of Health, Education and Welfare which holds that plaintiff is not entitled to have payment of hospital insurance benefits made on his behalf for services provided to William R. Whitman at the Libbie Rahabilitation Center, Inc. Jurisdiction of this Court is at-

tained pursuant to § 1869(b) of the Social Security Act, 42 U.S.C. § 1395ff(b). The plaintiff and the defendant have each moved for summary judgment.[1] Upon the pleadings and record before it, the Court deems the matter ready for disposition.

■■■ The sole issue before the Court is whether the final decision of the Secretary is based upon substantial evidence.[2] See 42 U.S.C. § 405(g). The function of the Court in this regard is neither to try the case *de novo*, nor to resolve mere conflicts in the evidence. The Court is duty bound, however, to give careful scrutiny to the whole record to assure that there is a sound foundation for the Secretary's decision, and that his conclusion is rational. Vitek v. Finch, 438 F.2d 1157 (4th Cir. 1971).

The facts in this matter are not disputed. William R. Whitman, at age 74, was admitted to the Retreat for the Sick Hospital, Richmond, Virginia, on April 9, 1970, with a diagnosis of left hemiplegra. He was then transferred to the Libbie Rehabilitation Center on April 26, 1970, where he remained until discharged on July 8, 1970.

By letter of August 21, 1970, the Department of Health, Education and Welfare notified Mr. Whitman that it was unable to pay the claim for hospital insurance benefits submitted on his behalf by Libbie. The reason given by the Department for denying Mr. Whitman's claim was:

> The type of care you received during this stay was general institutional care which assisted you to meet your personal needs of daily living . . . . This care does not require the continuous supervision on a 24-hour basis of a professional nurse. Such care is excluded under the Medicare Law. (Tr. 150)

Mr. Whitman, by counsel, requested a hearing before an examiner on March 4, 1971 (Tr. 27). After a considerable delay, during which Mr. Whitman died, a hearing was held on January 28, 1972. At that hearing, Dr. Joseph G. Rhode, who had been Mr. Whitman's personal physician, testified as to Mr. Whitman's medical history.

Dr. Rhode stated that Mr. Whitman had suffered a cerebral vascular accident in 1965 which left Mr. Whitman completely paralyzed on his left side. He did remain self-ambulatory, however, with the use of a tripod walking cane.

Approximately one year later, Mr. Whitman suffered a heart attack and was admitted to the Medical College of Virginia for treatment. While Mr. Whitman's recovery was described as "unremarkable," he again remained self-ambulatory with the aid of his cane. (Tr. 41–42).

Sometime thereafter, Mr. Whitman experienced a bowel obstruction for the treatment of which he was admitted to the C. & O. Hospital in Clifton Forge, Virginia. The bowel lesion was biopsied and was found to be a villus adenoma, or a premaligant tumor. The surgeons at Clifton Forge performed a colostomy but did not remove the primary obstructing lesion.

During the latter part of 1968, Mr. Whitman returned to Richmond. Dr. Rhode testified that he was concerned that the lesion might develop into a malignancy and, therefore, arranged for Mr. Whitman to undergo a succession of surgical procedures at Richmond Memorial Hospital. This series of four or five operations was performed over the period of a year and resulted in the removal of the lesion and the repair of Mr. Whitman's bowel (Tr. 42–43).

Dr. Rhode testified that during Mr. Whitman's convalescence at Richmond

---

1. Motions for summary judgment are not, in a technical sense, the proper procedure in matters such as this. The applicable statutory provisions limit judicial review to an examination of the pleadings and the transcript of the record.

2. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

Memorial, he began to lose his ability to ambulate due to muscle atrophy resulting from a lack of physical therapy. At the same time, Mr. Whitman began to suffer from muscle contractures which caused a great deal of deformity and disability. Dr. Rhode then attempted to reinstitute physical therapy in order to prevent Mr. Whitman's becoming bedridden. These efforts were partially successful and Mr. Whitman was discharged and permitted to return home (Tr. 43).

Dr. Rhode continued that while Mr. Whitman was at home, his elderly wife was unable to adequately perform the type of therapy necessary to prevent the deterioration of his physical condition. Mr. Whitman's muscle contractures and weakness became increasingly severe to the point where he was no longer ambulatory. These muscle contractures were also associated with spasms and a considerable amount of pain (Tr. 44).

Mr. Whitman was then admitted to the Retreat for the Sick Hospital for the primary purpose of initiating intensive physical therapy. At Dr. Rhode's request, Mr. Whitman was also seen by a neurosurgeon, Dr. George Johnson, to determine if other neurological conditions existed which might hamper Mr. Whitman's recovery. It was Dr. Johnson's opinion that vigorous continuous physical therapy and muscle relaxant medications were the appropriate treatment (Tr. 45).

During the period of his hospitalization at Retreat for the Sick, Mr. Whitman's condition progressed, in terms of relaxing the muscle contractures, to the point where Dr. Rhode believed Mr. Whitman could be placed in a nursing home for further therapy. Mr. Whitman was then transferred to Libbie for the primary purpose of continuing an intensive physical therapy program (Tr. 45–46).

Mr. Whitman's initial evaluation at Libbie on April 27, 1970 indicated he was still unable to walk even with considerable support. The physical therapy exercise program planned for Mr. Whitman was as follows: "Will try to gain cooperation for developing capabilities for transferring from lying to sitting to standing. Try to gain standing balance and go through attempts to walk in parallel bars." (Tr. 135).

Hospital records submitted to the hearing examiner indicated that Mr. Whitman received physical therapy treatments on May 1, May 5, May 15 and May 19, 1970. Mr. Whitman, however, displayed a somewhat discouraged and uncooperative attitude and refused all physical therapy treatments from May 20, 1970 until he was discharged (Tr. 136–138). At hearing, Dr. Rhode testified that when he learned of the difficulty experienced by the physical therapist, he attempted to point out that it was a part of the therapist's responsibility to ovecome this type of problem in dealing with older patients. Dr. Rhode's efforts were apparently unsuccessful (Tr. 46–47).

Nurses' notes during the period of Mr. Whitman's hospitalization at Libbie reveal that he was up in a chair, uncooperative, and had quiet nights (Tr. 98–115). Medication records reveal that Mr. Whitman received daily injections of imferon for iron deficiency anemia from April 27 until May 4, 1970, when they were discontinued. Mr. Whitman also received an injection of valium on May 6, 1970. All other medications given to Mr. Whitman were administered orally (Tr. 120–134). The discharge summary prepared at Libbie indicated that Mr. Whitman had been admitted to Libbie for continued physical therapy with ambulation being the ultimate goal. This summary noted that he was being discharged after two and one-half months, improved but not ambulatory (Tr. 90).

The only other medical evidence adduced at hearing was the testimony of Dr. William R. Irby who served as medical advisor to the examiner. Dr. Irby testified that the actual levels of services received by Mr. Whitman at Libbie were not of the level contemplated to be covered by the Health Insurance Program.

Dr. Irby also testified that if the services and treatment which were planned by Dr. Rhode had been carried out, then they would have been of the high level of care contemplated by the Social Security Act (Tr. 51–52).

On the basis of the evidence presented, the hearing examiner determined that Mr. Whitman was entitled to hospital insurance benefits (Tr. 15–22). Subsequently, upon its own motion, the Appeals Council reviewed the award and on July 27, 1972 it reversed the examiner's decision (Tr. 3–11). William E. Whitman commenced this action within sixty days of notification of the Appeals Council decision in order to seek review of what is, by virtue of the Appeals Council determination, the Secretary's final decision. [3]

[4] The precise issue in this matter is whether the record provides substantial evidence to support the Secretary's decision that the care admininstered to Mr. Whitman while at Libbie was custodial in nature and, therefore, nonreimbursable pursuant to § 1862(a) of the Social Security Act, 42 U.S.C. § 1395y(a)(9). If, however, the Court finds the "custodial care" exclusion was erroneously applied to Mr. Whitman, then it is clearly within the Court's power to modify or reverse the decision of the Secretary without remanding the case for a rehearing. 42 U.S.C. § 405(g). [4]

While the Social Security Act [5] does not define "custodial care" beyond the meaning imparted by the words themselves, see 42 U.S.C. § 1395y(a)(9), the Appeals Council in its decision in this matter has noted that "custodial care" is generally defined as:

(C) are designed essentially to assist an individual to meet the activities of daily living. Such activities include assistance in bathing, feeding, and supervision of medication which can usually be self-administered. These services do not require the continuing attention of trained medical or paramedical personnel. *Where the primary purpose of the care furnished an individual is supportive* and to assist in activities such as those listed above, *such care is considered custodial.* (Tr. 8). (Emphasis added).

Additionally, the regulations promulgated by the Department of Health, Education and Welfare pursuant to the Social Security Act state that custodial care, in the case of extended care services, is any care which does not meet the definition of extended care in 20 C.F.R. §§ 405.126–405.128. See 20 C.F.R. § 405.310(g). The pertinent parts of those regulations defining "post-hospital extended care" are as follows: 20 C.F.R. § 405.126:

Post-hospital extended care is that level of care provided after a period of intensive hospital care to a patient who continues to require skilled nursing services . . . on a continuing basis . . . but who no longer requires the constant availability of medical services provided by a hospital.

20 C.F.R. § 405.127:

(a) *Defined.* A skilled nursing service is one which must be furnished by or under direct supervision of licensed nursing personnel and under the general direction of a physician in order to assure the safety of the patient and

---

3. Upon the joint motion of plaintiff and defendant, the Court remanded this matter to the Appeals Council on May 24, 1973 for the limited purpose of correcting an error in the Council's transcript. This error was corrected by Supplemental Transcript dated July 18, 1973.

4. There is no question that Mr. Whitman was qualified for posthospital extended care benefits in all other respects by virtue of his

age, 42 U.S.C. § 1395c, and prior hospital confinement, 42 U.S.C. § 1395d(a)(2), or that Libbie was a qualified extended care facility under the Social Security Act, 42 U.S. C. § 1395x(j).

5. The applicable law in this matter is not affected by the provisions of the Social Security Act Amendments of 1972. See Public Law 92–603, section 277, amending 42 U.S.C. § 1395f.

achieve the medically desired result. Skilled nursing includes:

(1) Observation and assessment of the total needs of the patient.

(2) Planning and management of a treatment plan; and

(3) Rendering direct services to the patient.

(b) *Specific services; services which are skilled.* Based upon the general principles set forth in paragraph (a) of this section skilled nursing services include but are not limited to:

(1) Intravenous or intramuscular injections and intravenous feeding;

. . . . . .

(c) *Evaluation of services as skilled or unskilled.* In evaluating whether services not enumerated in paragraph (b) of this section are skilled or unskilled nursing services, the following principles shall be applied:

(1) The classification of a particular service as either skilled or unskilled is based on the technical or professional training required to effectively perform or supervise the service. For example, a patient, following instructions, can normally take a daily vitamin pill. Consequently, the act of giving the vitamin pill to the patient because he is too senile to take it himself would not be a skilled service. Similarly, State law may require that all institutional patients receive medication only from a licensed nurse. This fact would not make administration of a medication a skilled nursing service if such medication can be prescribed for administration at home without the presence of a skilled nurse.

(2) The importance of a particular service to an individual patient does not necessarily make it a skilled service. For example, a primary need of a nonambulatory patient may be frequent changes of position in order to avoid development of decubiti. Since changing of position can ordinarily be accomplished by unlicensed personnel, it would not be a skilled service.

(3) Skilled paramedical services involving specialized training outside the nursing curriculum are not skilled nursing services. For example, physical, occupational, and speech therapy are discrete treatment modalities requiring specialized training for proper performance. A need for one or more of these therapies would not necessarily indicate a need for skilled nursing care.

. . . . . .

(d) *Specific services; supportive or unskilled services.* Supportive services which can be learned and performed by the average nonmedical person (and which are not skilled services in the absence of conditions specified in paragraph (c)(5) of this section) include but are not limited to:

(1) Administration of routine oral medications, eye drops, and ointments;

. . . . . .

(11) General supervision of exercises which have been taught to the patient;

(12) Assistance in dressing, eating, and going to the toilet.

20 C.F.R. § 405.128:

Skilled nursing services are required on a continuing basis (see § 405.126) when the continuing availability of skilled nursing personnel is warranted. In determining whether the continuing availability of skilled nursing personnel is warranted, the following principles apply:

(a) *Frequency of services.* The frequency of skilled nursing services required, rather than their regularity, is the controlling factor in determining whether the continuing availability of skilled nursing personnel is warranted. For example, a patient may require intramuscular injections on a regular basis every second day. If this is the only skilled service required, it would not necessitate the continuing availability of skilled nurses.

(b) *Observation.* Observation may be the principal continuous service when the unstabilized condition of the patient requires the skills of a licensed nurse to detect and evaluate the patient's need for possible modification of treatment or institution of medical procedures. For example, pending stabilization of the condition, a patient suffering from arteriosclerotic heart disease may require continuous close observation by skilled nurses for signs of decompensation and loss of fluid balance in order to determine whether the digitalis dosage should be changed or other therapeutic measures should be taken. Similarly, in some cases, surgical patients (including cataract patients) are transferred from a hospital to an extended care facility while still in the immediate unstabilized postoperative period during which the possibility of adverse reaction to anesthesia and other aspects of the operative procedure necessitates close skilled monitoring. (This latter situation is, of course, the converse of the "uncomplicated" convalescent stage following the "average" hospital stay for surgery.)

■■ Initially, the Court notes that while the regulations promulgated by the Secretary are helpful in clarifying the languge of the statute, they must not be allowed to destroy the spirit of the law. Pippin v. Richardson, 349 F. Supp. 1365 (M.D.Fla.1972). In this instance, the Medicare Act, which creates health insurance for the aged, is remedial in nature and, therefore, is to be construed liberally to effectuate the congressional purpose of insuring that adequate medical care is available to the aged. See U.S.Code Cong. and Admin. News, 89th Cong., 1st Sess., p. 1964 (1965).

With particular reference to the exclusion of custodial care contained in 42 U. S.C. § 1395y(a)(9), this Court has previously cited with approval the words of Chief Judge Northrop in Ridgely v. Secretary of H.E.W., 345 F.Supp. 983 (D.Md.1972), aff'd 475 F.2d 1222 (4th Cir. 1973), wherein he stated:

Indeed, it appears to this Court that the purpose of the custodial care disqualification . . . was not to disentitle old, chronically ill and basically helpless, bewildered and confused people . . . from the broad remedy which Congress intended to provide for our senior citizens. Rather, the provision was intended to stop cold-blooded and thoughtless relatives from relegating an oldster who could care for him or herself to the care of an ECF merely so that that oldster would have a place to eat, sleep or watch television. But when a person is sick, especially a helpless old person, and when those who love that person are not skilled enough to take care of that person, Congress has provided a remedy in the Medicare Act, and that remedy should not be eclipsed by an application of the law and findings of fact which are blinded by bureaucratic economics to the purpose of the Congress. 345 F.Supp. at 993. Cited in Harris v. Richardson, 357 F.Supp. 242 (E.D.Va.1973).

Previous regulations of the Department of Health, Education and Welfare concerning extended care benefits came under sharp criticism. In Sowell v. Richardson, 319 F.Supp. 689 (D.S.C. 1970), for example, the Court, in reversing the Appeals Council's denial of benefits, rejected the Secretary's contention that "covered care" meant only such treatment as "must be given under the supervision of a registered professional nurse." Judge Hemphill went on to note:

Under [the Secretary's] formula for determining whether the services are covered, only the service actually rendered is considered. The condition of the insured and manifest symptoms of the illness are in his view only relevant to the extent that they determine the treatment administered . . . . It was never intended by Congress that the condition of the insured, treatment that might at any

time be necessary, and the pain and discomfort attending inadequate or unprofessional care or lack of care not be considered together with treatment actually provided in determining whether extended care services are justified. Every aspect of the plaintiff's physical condition must be considered in making the determination. Treatments immediately required are of course a major factor. However, even if no treatment were required the condition of the insured might be so unstable or unsatisfactory as to require the extended services contemplated by the statute. 319 F.Supp. at 692.[6]

The current departmental regulations, cited herein, have been the subject of similar criticism. See Pippin v. Richardson, *supra,* and Allen v. Richardson, 366 F.Supp. 516 (E.D.Mich.1973). In *Pippin,* Judge Krentzman noted that the then newly enacted regulations continued to unnecessarily limit consideration to the services actually rendered to a patient. He went on to state:

> Obviously, services rendered must remain the most important objective fact which presents itself in determining the medical necessity of the extended care services. Nevertheless, other factors must also be considered. In many medical conditions of an unstable nature, a patient requires constant skilled surveillance in order to interpret vital life signs and determine when and if specific medical treatment is necessary. In excluding "custodial care" from coverage under the Act, Congress did not intend to thereby prohibit benefits to those who need more than the convenience of nursing home facilities for help in their daily routine. 349 F.Supp., at 1369.

In reversing the decision of the Appeals Council, Judge Krentzman noted that the Council "did not even take a glimpse at the totality of care received by plaintiff." Id. at 1370.

These authorities lead the Court to conclude that the proper approach is a pragmatic case-by-case analysis of the facts involved. To do otherwise, that is to mechanically apply the technical terms contained in the Act in the manner suggested by the defendant, would serve only to frustrate the attainment of the broad objectives Congress intended.

In the instant matter, the Secretary, in his brief supporting his motion for summary judgment, notes that he:

> [R]elied on the testimony of Dr. W. Robert Irby, who stated that the level of care which Mr. Whitman received in the extended care facility could have been provided by a person who was not necessarily a trained medical person and that the services provided could have been received at home. Brief for Defendant at 16.

While the Secretary may generally rely on the testimony or report of a medical advisor, Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Court deems such reliance unwarranted where it focuses solely upon testimony related to care actually rendered to the exclusion of testimony concerning the patient's overall condition or need for medical care.

Moreover, the Appeals Council has made no mention of a regulation in effect at the time the decision was rendered which stated:

> Because there are significant divergences in opinion among individual physicians with respect to evaluation of medical necessity for posthospital extended care services, the judgment of the attending physician in an extended care case is given great weight, and is not rejected except under unusual circumstances. 20 C.F.R. § 405.1137(g)(3).[7]

6. The "total patient condition" test has been adopted by numerous courts. See, e. g., Reading v. Richardson, 339 F.Supp. 295 (E.D.Mo.1972); Ridgely v. Secretary of H. E. W., *supra,* and Harris v. Richardson, *supra.*

7. While this regulation has since been deleted, see 39 Fed.Reg. 2240, the Court will not give retroactive effect to that change in evaluating the Secretary's decision.

The Appeals Council, however, has not identified any unusual circumstances in Mr. Whitman's case which would serve to rebut Dr. Rhode's evaluation of medical necessity. [8]

The Secretary also contends that a need for physical therapy does not necessarily indicate a need for skilled nursing care on a continuing basis and that it is the latter need alone which triggers posthospital extended care benefits. The Court has found at least one authority which has squarely dealt with and has rejected this contention. In Lord v. Richardson, 356 F. Supp. 232 (S.D.Ind.1972), Judge Noland stated:

The legislative history of the Social Security Act relating to physical therapy services reveals that this interpretation is incorrect to the extent that it intimates that physical therapy does not constitute skilled nursing care:

"Under present law, health insurance benefits may generally be made for physical therapy services when provided to an inpatient in a hospital or extended care facility . . . ."

A Congressional intention to include physical therapy treatments within the definition of "skilled nursing care" is further evidenced by the fact that the medical benefits have been extended to compensate even out-patient physical therapy services in appropriate cases. 42 U.S.C. § 1395x(s)(2)(D). Moreover, Section 1861(h) of the Act defines extended care services (entitling the recipient to benefits) to include:

" . . . physical, occupational, or speech therapy furnished by the extended care facility or by others under arrangements with them made by the facility . . . ." 356 F. Supp. at 234–235.

The Court concurs with Judge Noland's interpretation of the Act and rejects the Secretary's conclusion of law on this matter. [9]

It is clear to the Court that the primary purpose for Mr. Whitman's hospitalization at Libbie was to aid him in regaining his ability to ambulate. Considering the totality of Mr. Whitman's physical condition, as well as the physical therapy treatment program which had been planned for him, the Court finds Mr. Whitman's hospitalization at Libbie was not merely custodial or supportive care, but rather was designed to be responsive to his medical needs. While his uncooperative attitude made treatment difficult, it tends to underlie his need for care even more skilled than was provided by his therapist at Libbie. See Schoultz v. Weinberger, 375 F.Supp. 929, 933 (E.D.Wisc.1974) and Bremer v. Richardson, 347 F.Supp. 465, 469 (D. Neb.1972).

Consequently, it is the finding of the Court that the Secretary's decision denying the plaintiff's claim for post-hospital extended care benefits was not supported by substantial evidence. The Court, therefore, will deny the Secretary's motion for summary judgment. Further, the Court will grant the plaintiff's motion for summary judgment and will order the Secretary to make payment of hospital insurance benefits for services provided by the Libbie Rehabilitation Center, Inc. to William E. Whitman during the period of April 26, 1970 through July 8, 1970.

An appropriate order shall issue.

---

8. The Court also notes that the Utilization Review Committee at Libbie certified Mr. Whitman's need for extended care facility in-patient care on April 26, May 10, and June 4, 1970 (Tr. 74). While such certifications are not binding on the Secretary, they may be considered along with other pertinent medical evidence. See 20 C.F.R. § 405.206.

9. Such conclusions are subject to broader judicial review than are findings of fact made by the Secretary. Ridgely v. Secretary of H. E. W., supra.