Thomas M. OLSON, as Personal Representative of the Estate of Helen S. Olson, Deceased, Respondent,

v.

BLUE CROSS AND BLUE SHIELD of Minnesota, Appellant.

No. 47877.

Supreme Court of Minnesota.

June 2, 1978.

Thompson, Hessian, Fletcher, McKasy & Soderberg and David Morse and Margo Struthers, Minneapolis, for appellant.

Meyer, Hiniker & Fleming, White Bear Lake, for respondent.

Heard before ROGOSHESKE, YETKA and SCOTT, JJ., and considered and decided by the court en banc.

YETKA, Justice.

Appeal by defendant from a judgment of the Ramsey County District Court and from an order denying a motion for amended findings of fact, conclusions of law, and order for judgment. The district court determined that Helen S. Olson,[1] plaintiff's decedent, was in need of and had received "skilled nursing care" during her stay in several nursing homes and that she was entitled to coverage under defendant's health insurance policy which contained an exclusion for "custodial care." We affirm.

During the period involved in the present lawsuit, Ms. Olson was covered under an insurance contract with defendant for supplemental catastrophic medical services.[2] Part VIII of the contract contained exclusions for certain kinds of coverage, including—

---

1. Helen Olson, the original plaintiff in this case, died after the appeal was filed. Her personal representative was substituted as a party.

2. The contract stated in several places that the coverage was supplemental to Medicare, the hospital and supplemental medical insurance plan established by Title XVIII of the Social Security Act of 1965. It also stated that it was supplemental to any other similar insurance.

"8. services and supplies which are furnished;

\* \* \* \* \* \*

"c. primarily for rest cures, *custodial care*, domiciliary care, or ·for the convenience of a household." (Italics supplied.) Prior to March 30, 1972, Ms. Olson had a history of mild diabetes, and on that date she suffered a severe stroke causing paralysis to her right side and some loss of speech.

Ms. Olson was confined to several hospitals and nursing homes from March 30, 1972, through August 5, 1972. From August 5, 1972, to December 1, 1973, Ms. Olson was confined to three nursing homes and defendant paid plaintiff the maximum amount allowable under the policy for that period.

From December 1, 1973, until the time of trial, Ms. Olson was confined in nursing homes with occasional periods of hospitalization in Midway Hospital. Defendant refused to pay any benefits to Ms. Olson after December 1, 1973, because it claimed that the care Ms. Olson received was "custodial care" and thus excluded by the policy. The parties stipulated that the maximum amount payable under the contract was $12,678.12.

The trial court found that—

" \* \* \* [p]laintiff continues to suffer paralysis in her right side, speech and face, and requires daily insulin for her diabetic condition, as well as other medication. Throughout said period she has received therapy, must be fed at every meal, must be bathed, and needs assistance to take care of all of her bowel functions and all other personal needs."

The defendant raises three issues on appeal:

(1) Did the trial court fail to make necessary findings as to whether the care furnished to Ms. Olson was "custodial care" and whether the insurance contract was supplemental to Medicare?

(2) Was the trial court clearly erroneous in finding that Ms. Olson needed and was provided "skilled nursing care"?

3. The only definition which conceivably depends upon Medicare definitions is the defini-

(3) Did the trial court abuse its discretion in questioning one of defendant's witnesses?

1. Failure to make necessary findings.

■ Defendant claims that the trial court failed to make necessary findings on the issues of "custodial care" and whether the insurance was supplemental to Medicare. Although the insurance policy is clearly designed to supplement Medicare as well as other insurance benefits, there is no indication in the policy itself that the definitions of "custodial care" or "skilled nursing care" are dependent upon the so-called Medicare Act.[3] Thus, although the court could have used the definitions of the terms involved as developed in Federal cases interpreting the Medicare Act as persuasive authority, the finding that the contract was supplemental to Medicare was not necessary.

■ Defendant also claims that the trial court was required to make a finding that it used Medicare regulations and guidelines to determine coverage under the policy in question. This claim is difficult to understand unless defendant is requesting a finding that the Medicare regulations are a part of the contract. It is uncontroverted that defendant did use such guidelines, but its claim is defective in two respects.

First, the regulations introduced by defendant which may be relevant to the present case are those which define skilled nursing and personal services care, 20 CFR § 405.127 (1975). These regulations were not adopted until September 24, 1975, and were not a part of the contract which was originally issued in 1966.

■ Secondly, even if the regulations had been adopted earlier and had been in effect at the time of the policy's issuance, the trial court should have found that they were not a part of the policy. Application of such detailed guidelines would result in restrictive coverage. The defendant, had it

tion of "approved bed" in Part IV. This definition is not at issue in the present case.

desired to include definitions found in the regulations, could have expressly done so. An insurance policy is to be construed liberally in favor of the insured, *Weum v. Mutual Benefit Health & Accident Assn.*, 237 Minn. 89, 54 N.W.2d 20 (1952). The defendant cannot insist on the strict Medicare definitions of "skilled nursing services." [4]

■ The insurance policy at issue in the present case excludes coverage for "custodial care" services, and defendant's denial of benefits was based on this exclusion. The trial court, however, made no express findings on the question of whether the care provided Ms. Olson was "custodial care." It found instead that she was in need of and was provided with "skilled nursing care." If the court concluded that the terms "skilled nursing care" and "custodial care" were mutually exclusive, then the findings it actually made were impliedly a finding that the care given Ms. Olson was not "custodial care." We believe this to be a reasonable interpretation of the trial court's findings. This interpretation is borne out by application of the principle that the denial of a proposed amended finding is equivalent to a contrary finding. *Roberge v. Cambridge Cooperative Creamery Co.*, 248 Minn. 184, 195, 79 N.W.2d 142, 149 (1956); *Kloster Madsen, Inc. v. Tafi's, Inc.*, 303 Minn. 59, 62, 226 N.W.2d 603, 606 (1975). Defendant's motion for amended findings included the following proposal:

"XVI.

"That the services provided to plaintiff after December 1, 1973, constitute custodial care."

The court denied defendant's motion and thus found that the services did not constitute "custodial care."

2. Skilled nursing care and custodial care.

(a) The court's finding.

■ Defendant claims that the conclusions that Ms. Olson needed and was provided "skilled nursing care" were not sup-

ported by the findings because no definition of "skilled nursing care" was provided in the findings. It also claims that the finding that Ms. Olson "has been in need of [and] requires skilled nursing care" was clearly erroneous.

Dr. Kenneth Lerdahl, Ms. Olson's personal physician, testified that she was in need of skilled medical and nursing help. He further testified that the care she needed went beyond "custodial care." This testimony was consistent with a letter written by Dr. Lerdahl concerning Ms. Olson in December 1974.

■ Defendant's medical director, Dr. Donald Woodley, testified, however, that the care given Ms. Olson from December 1, 1973, until the time of trial was "custodial care." That opinion was based entirely on checklist reports made by the nursing homes to defendant's claims department. Dr. Woodley never personally examined Ms. Olson and never contacted Dr. Lerdahl.[5] The trial court's findings that Ms. Olson required "skilled nursing care" and was provided with "skilled nursing care" are amply supported by the testimony of Dr. Lerdahl. All of the check sheets reviewed by Dr. Woodley were signed by nursing personnel and it is clear that his conclusions were based completely on strict application of detailed Medicare definitions. A finding is clearly erroneous if it is not reasonably supported by the evidence as a whole. *Northern States Power Co. v. Lyon Food Products*, 304 Minn. 196, 229 N.W.2d 521 (1975). The trial court's finding that plaintiff required "skilled nursing care" was adequately supported in the testimony of Dr. Lerdahl and the documentary evidence.

(b) Medicare definition of "custodial care."

Although the Medicare definitions are not controlling in the present case, each party attempts to use cases decided under the Medicare "custodial care" exclusion to

---

4. The Medicare Act excludes payment for "custodial care," 42 U.S.C.A. § 1395y(a)(9), but the term is not defined in the statute itself.

5. The trial court was obviously impressed by this lack of contact and made a specific finding on the point.

support its position. A review of the factual settings of those cases convinces us that the care supplied to plaintiff was not merely "custodial care" under the liberal interpretations given to the Medicare Act.[6]

In several cases similar to the present case, courts have reversed the administrative denial of benefits under the Medicare "custodial care" exclusion. In *Whitman v. Weinberger*, 382 F.Supp. 256 (E.D.Va.1974), the patient was a 74-year-old man who had suffered a stroke. He suffered various other attacks and was ultimately admitted to a nursing home. His care included intensive physical therapy, daily medications, and observation for a generally deteriorating physical condition. The court stated that a pragmatic, case by case, analysis of custodial care was necessary, and that the secretary of health, education and welfare must consider not only services given, but the patient's overall need for medical care.

In *Coe v. Secretary of Health, Education and Welfare*, 502 F.2d 1337 (4 Cir. 1974), the court reversed a lower court's decision excluding certain services from Medicare under the "custodial care" exception. The services held to be more than custodial care were almost exactly the same as those provided Ms. Olson in the present case, including feeding, position changing, physical therapy, and the use of a urinary catheter. The court relied upon the following definition of the term "custodial" care: "[M]arked by or given to watching and protecting rather than seeking to cure [for example] custodial care rather than a therapeutic program." 502 F.2d 1340.

In *Klofta v. Mathews*, 418 F.Supp. 1139 (E.D.Wis.1976), the court found that the plaintiff's decedent had received "skilled nursing care" and was entitled to Medicare benefits. The patient received physical therapy, medication, assistance in going to the toilet, and other personal care services.

The court held that where the patient required the care of skilled personnel, she was receiving "skilled nursing *care*," even if she was not receiving skilled nursing *services* within the meaning of 20 CFR § 405.127. It also held that the court was not bound by the regulations. The court quoted with approval the following:

"[Custodial care] is care that could be administered by a layman, without any possible harm to the one in custody. * * This view of 'custodial care' is also in agreement with the definition of 'custodial' as found in Webster's Third New International Dictionary (1967 ed.), i. e., 'relating to or marked by guardianship or maintaining safely.' Thus, mere 'custodial care' refers quite simply to guardianship for convenience that has no significant relation to medical care of any type. *Samuels v. Weinberger*, 379 F.Supp. 120, 123 (S.D.Ohio 1973)." 418 F.Supp. 1143.

The Medicare cases consider not only the actual services rendered but also the need for extended medical care, *Rockingham National Bank v. Weinberger*, 381 F.Supp. 373 (W.D.Va.1974), and the possible medical consequences of the patient's not receiving care. *Bremer v. Richardson*, 347 F.Supp. 465 (D.Neb.1972). In light of Dr. Lerdahl's testimony and the actual provision of care by skilled nursing personnel, even under Medicare the care given Ms. Olson would have qualified for reimbursement.[7]

3. Examination of Dr. Woodley by the court.

After both attorneys had completed their questioning of defendant's medical director, Dr. Woodley, the court questioned him primarily about his failure to consult with Dr. Lerdahl. The questioning was sharp and defense counsel objected. The defendant claims that the trial judge became an advocate to such an extent that

---

6. A parallel might be drawn between the requirement that the Medicare law be liberally construed to include coverage, *Whitman v. Weinberger*, 382 F.Supp. 256, 262 (E.D.Va. 1974), and the principle that an ambiguous insurance policy must be strictly construed against the insurer.

7. Custodial care exclusions were upheld in *Weir v. Richardson*, 343 F.Supp. 353 (S.D.Iowa 1972) (no evidence that skilled nursing care was required); *Sokoloff v. Richardson*, 383 F.Supp. 234 (E.D.N.Y.1973) (afflictions of old age required only custodial care).

a new trial is required. The only case cited by defendant in support of this position is *Reserve Mining Co. v. Lord*, 529 F.2d 181 (8 Cir. 1976). The kind and extent of the claimed advocacy in *Reserve* was so different from the trial court's questioning in the present case that no extended discussion is necessary. It is within the discretion of the trial court to question a witness called by a party. *State v. Sandquist*, 146 Minn. 322, 178 N.W. 883 (1920). See, also, *Taylor v. Taylor*, 177 Minn. 428, 225 N.W. 287 (1929).[8] In the present case, the trial judge waited for the parties to complete their examination. See, *Taylor v. Taylor, supra*. His questions were sharp and argumentative, but counsel for plaintiff had partially covered the same ground. The trial court's findings would have been supportable, even without the testimony elicited. The questioning was not so strong as to indicate bias or prejudice. In light of the fact that this was a court trial and the court had the duty to make a decision in the case, there was no abuse of discretion. Trials, after all, are not simply courtroom dramas but a search for justice. If a trial court is doubtful about the testimony of any witness in a court trial, he may have not only the right but the duty to interrogate a witness.

Affirmed.

---

8. This is the rule in most jurisdictions. See, 3 Wigmore, Evidence (Chadbourn Rev.) § 784; McCormick, Evidence (2 ed.) § 8.